**COLONIAL TRUST CO. v. KRAEMER,**
Collector of Internal Revenue
(two cases).

Civil Actions Nos. 1257, 1258.

District Court, D. Connecticut.
Dec. 26, 1945.

Spencer, Ordway & Wierum, of New York City, and Cummings & Lockwood, of Stamford, Conn. (Otto C. Wierum and John A. McManus, both of New York City, and Raymond E. Hackett, of Stamford, Conn., of counsel), for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Frederic G. Rita, Sp. Assts. to Atty. Gen., and Robert P.

**868**

Butler, U. S. Atty., and Edward J. Lonergan, Asst. U. S. Atty., both of Hartford, Conn., for defendant.

HINCKS, District Judge.

These are actions brought under 28 U.S. C.A. § 41(5), to recover estate taxes which the plaintiff claims were erroneously and illegally assessed against the estates of Gertrude B. Whittemore and Justine B. Whittemore and paid under protest by the plaintiff as executor of those estates. Claims for refunds were rejected by the Commissioner of Internal Revenue. It was agreed that the two cases should be tried together, and a separate judgment entered in each.

Findings of Fact

1. Gertrude B. Whittemore died on April 8, 1941, and Justine B. Whittemore died on October 5, 1940.

2. The plaintiff elected to have each estate valued on the anniversary date.

3. At the time of her death, Gertrude B. Whittemore owned 720 shares of stock of the J. H. Whittemore Company. At the time of her death, Justine B. Whittemore owned 20 shares of the same stock.

4. The J. H. Whittemore Company is and always has been a family corporation specially chartered by an Act of the Connecticut Legislature approved March 2, 1899, 13 Sp.Laws, p. 18. It has an authorized capital of $200,000, represented by 2,000 shares of stock with a $100 par value. At the time of the death of the decedents, there were 1580 shares of the capital stock of the corporation outstanding, 420 shares having previously been purchased by the corporation and held in its treasury. The 1580 shares were at that time owned by seven stockholders, all of whom were descendants or spouses of descendants of John H. Whittemore.

The corporation has its principal place of business in Naugatuck, Connecticut, and its business consists of: (1) ownership and management of improved and unimproved real estate in and around the towns of Naugatuck and Middlebury, including a farm and a large acreage of undeveloped land; (2) the ownership, care, custody and protection of a large collection of works of art, and (3), the purchase, sale and ownership of securities.

The principal revenues accruing to the corporation arise from the third function above mentioned, and approximately 80%

of the total revenues were consumed during a period of five years ending with 1940 by the operating expenses of the corporation. The average dividend paid on the stock during the five year period was approximately 1% of the average book value. The average yearly earnings of the corporation for the five year period were $10,000.

The corporation also managed the personal affairs of some members of the family, for which management fees were charged. In 1939 the revenue from that source was $11,311.42, or more than 40% of the net profit. That income was considerably reduced at the death of Gertrude B. Whittemore, whose estate was the largest handled by the corporation.

The produce of the farm is sold to members of the family and to other customers. The members of the family were treated as having pre-emptive right thereto, but they paid the same prices as other customers.

Some of the art works are stored in vaults and some in houses occupied by members of the family.

5. The stock of the corporation has never been listed on any exchange, and no market has ever been established or maintained for the stock. There have been only three sales of the stock of the corporation in its entire history.

On February 16, 1938, the corporation purchased from Austin L. Adams, the spouse of a deceased member of the Whittemore family, and from the estates of his infant children, 29 shares of its stock at $1,404 per share. That figure was determined by dividing by the number of shares outstanding the total book value of the corporate portfolio of securities and cash, plus one-half the book value of all other assets. The book values of the securities were at that time in excess of current market values.

On November 7, 1939, the corporation purchased from the same sources 391 shares of its stock at $1,000 per share. That price was the result of an offer made to the company by Austin L. Adams.

On June 18, 1942, 186 shares of stock of the corporation were sold at public auction in the City of Boston at $252 per share. These securities were advertised in a newspaper of large and general circulation in Boston on three days previous to the sale. The sale price represents the highest bid received, and the stock was sold

to the high bidder, Harris Whittemore, Jr., of Naugatuck.

6. In her last will and testament, dated December 6, 1940, Gertrude B. Whittemore made the following gift: "To Austin L. Adams, the husband of my deceased niece, Helen, I give and bequeath the sum of One Hundred and Twelve Thousand Dollars ($112,000.), being the assumed equivalent of eighty-one (81) shares of stock of the J. H. Whittemore Company."

7. Neither the by-laws of the corporation nor the Joint Resolution chartering it contain any provision relating to the rights of minority stockholders.

8. The book value of the stock of the corporation was $1,636.82 per share on October 5, 1941, and $1,485.15 per share on April 8, 1942.

9. The Commissioner finally determined the value of the stock on October 5, 1941, to be $1,636.82 per share and upon that basis assessed a deficiency against the estate of Justine B. Whittemore.

10. The fair market value of the stock of the J. H. Whittemore Company was less than $1,000 per share on October 5, 1941.

11. The Commissioner finally determined the value of the stock on April 8, 1942 to be $1,495.45 per share. This determination was in large part the basis of deficiencies assessed against the estate of Gertrude B. Whittemore.

12. The fair market value of the stock of the J. H. Whittemore Company was less than $1,000 per share on April 8, 1942.

13. Prior to her death and during the year 1938, Gertrude B. Whittemore relinquished all the incidents of ownership in certain policies of life insurance which she had previously acquired. After January 10, 1941, this decedent paid certain premiums on the aforementioned policies of insurance. Pursuant to Section 81.27 of Treasury Regulations 105, approved February 18, 1942, the Commissioner included in the value of the estate of Gertrude B. Whittemore the sum of $10,915.50, as representing that proportion of the total insurance payable under those policies which the premiums paid by the decedent after January 10, 1941, bear to the total premiums paid on said policies.

14. In filing the estate tax return, the executor of the estate of Justine B. Whitte-more reported the stock at a value of $1,000 per share. On or about October 22, 1943, the Commissioner of Internal Revenue assessed a deficiency in tax against the plaintiff in the sum of $12,133.82, which the plaintiff paid on November 10, 1943, with interest thereon in the sum of $1,348.68. Of this amount, the increase in stock evaluation resulted in an assessment of $3,-332.52, including interest.

15. In filing the estate tax return, the executor of the estate of Gertrude B. Whittemore reported the stock at a value of $1,000 per share. Subsequently deficiencies were assessed against the plaintiff in the sum of $175,309.21 including interest. These deficiencies were based on (1) increased valuations of the stock of the J. H. Whittemore Company, (2) the inclusion in the gross estate of the value of certain items of life insurance, as set forth in paragraph 13 of this Finding, and (3) the inclusion of the value of the remainder interest in certain securities transferred in trust by the decedent.

## Conclusions of Law

1. The proper value, for estate tax purposes, to be placed upon the stock of a family corporation is the fair market value of the stock at the date of evaluation. 26 U.S.C.A. Int.Rev.Code, § 811.

2. The Commissioner was correct in including the proceeds of certain life insurance policies as required by Regulations 105, Articles 81.25 and 81.27 because:

(a) T.D. 5032 and Regulations 105, Articles 81.25 and 81.27 are correct in construing Section 302(g) of the Revenue Act of 1926 to require inclusion in the gross estate of proceeds of insurance policies in excess of $40,000 upon which the decedent paid the premiums.

(b) The statute so construed is constitutional.

(c) In the case of a decedent who took out certain policies of life insurance after the Revenue Act of 1918 and thereafter relinquished all incidents of ownership but continued to pay the premiums up until her death, which occurred before October 21, 1942, that portion of the proceeds of the policies in excess of $40,000 represented by the proportion the premiums paid by the decedent after the date of T.D. 5032 bear to the total premiums paid is includible in the gross estate for estate tax purposes. Revenue Act of 1926, Section 302(g), 44

Stat. 71, 26 U.S.C.A. Int.Rev.Acts, page 231.

### Opinion

1. Since this stock was reported in each estate tax return as having a value of $1,-000 per share, the plaintiff seeks to prove only that the value was not in excess of that figure. It has succeeded in establishing that the fair market value of the stock is substantially less than $1,000 per share.

There have been only three sales of the stock of the corporation in its entire history: in two of these, the company bought its own stock from a member of the family, and in the third the sale was to a member of the family; only one of these sales—the third—was at an advertised auction and within a year of either valuation date, and the sale price was $252 per share.

Faced with this situation, the plaintiff properly relied principally upon the testimony of two experts. The first of these, a man with forty years' experience in handling and evaluating investments, testified that he would not have advised the purchase of stock in this corporation at a price in excess of 30% of book value. In his opinion, the fair market value of the stock on April 8, 1942, was not in excess of 40% of book value. In arriving at that estimate, he considered among other factors the average trend of the assets of the corporation, the earnings, the ability to continue to earn and retain earnings and assets, and the fact that these shares represented a minority interest.

The second expert, a man with twenty years' experience in ascertaining the value of corporate securities, made a comparison of the liquidating value of the portfolios of five investment companies with the market values of their respective stocks on October 6, 1941, and on April 8, 1942, finding an average discount of 36% and 35.60%. Applying this discount to the book value of the stock of the J. H. Whittemore Company on October 6, 1941, and on April 8, 1942, gives values of $950.50 and $956.34.

■ Such a comparison is in accord with Section 501 of the Revenue Act of 1943, 26 U.S.C.A. Int.Rev.Code, § 811(k), as amended, and although this section was not in force on the date of the deaths of the decedents, it embodies a test well recognized before its enactment. Horlick v. Kuhl, D.C.Wis., 62 F.Supp. 168, 175.

It is true, as pointed out by the defendant, that these companies are not very similar to the J. H. Whittemore Company, that the latter is, in fact, quite unique. In response to questions put to him by the court, however, the witness testified that the differential between the liquidating and market values would be greater in the case of a corporation like the J. H. Whittemore Company.

■ When this evidence is considered together with the fact that the corporation suffered a net loss of $46,329 for the year ending December 31, 1941, the dividend for that year of $25 per share on 158 shares being paid out of capital surplus, and that the annual income from management fees was reduced considerably by the death of Gertrude Whittemore, it seems apparent that the market value of the stock did not exceed $1,000 on either valuation date. The statement in the will of Gertrude Whittemore indicating that she valued the stock of this corporation at approximately $1,400 per share on December 6, 1940 is of little aid in determining the fair market value of the stock on October 5, 1941, or on April 8, 1942.

The defendant suggests that the plaintiff's witness failed to take into account the fact that the purchase of the stock would have a "possibility" of forcing a liquidation because of the non-productive assets owned by the corporation. I think it highly unlikely that a court would force a liquidation at the instance of a minority stockholder when one of the obvious functions of the corporation is to hold such assets. At most, the purchaser would be buying merely the possibility of an expensive law suit and I find no suggestion in the evidence that the effect of such a purchase would be sufficient to raise the value of the stock above $1,000 per share.

The defendant argues that a valuation on the basis of book values would be more appropriate due to the fact that the corporation owns a large amount of property which is maintained at a deficit to the corporation. As to this, one of the experts called by the plaintiff admitted on cross-examination that the value of J. H. Whittemore stock would be greater if it did not own those properties—but that even then it would not have a market value in excess of $1,000 per share. Certain benefits even from deficit-producing assets did flow to the stockholders of the corporation, such

as a possible preference to the produce of the farm and the possible privilege to possess and enjoy the works of art.

 The clear policy of the statute and applicable treasury regulation indicates, however, that it is the fair market value of the stock or its approximation based on the company's earning power, dividend-paying capacity, and all other factors, that is to be considered for estate tax purposes. 26 U.S.C.A. Int.Rev.Code, § 811(k), as amended, Treasury Regulations 79, Section 19(3), as amended by T.D. 4901. And that policy applies to closed or family corporations such as the one here. Weber v. Rasquin, 2 Cir., 101 F.2d 62, Worcester County Trust Co. v. Commissioner, 1 Cir., 134 F.2d 578, Laird v. Commissioner, 3 Cir., 85 F.2d 598, Horlick v. Kuhl, D.C.Wis., 62 F.Supp. 168, Blackard v. Jones, D.C.Okl., 62 F.Supp. 234. See, also, Richardson v. Commissioner, 2 Cir., 151 F.2d 102 and Commissioner v. McCann, 2 Cir., 146 F.2d 385, decided under the gift tax statute. If this method of evaluation leaves the door open to partial evasion of the estate tax through the organization of a family corporation it is nevertheless an incident of the present tax policy and it is the province of Congress to close that door.

2. The statute in force at the death of these decedents governing the estate tax on the proceeds of life insurance provided that there should be included in the gross estate the excess over $40,000.00 of the amount receivable by beneficiaries other than decedent's executor under policies "taken out by decedent upon his own life." Revenue Act of 1926, Section 302(g), 44 Stat. 71, 26 U.S.C.A. Int.Rev.Acts, page 231. In the regulations of the Treasury Department and the decisions of courts construing that phrase there have developed two tests: the "premium test" and the "incidents of ownership test." The regulations have described a complete cycle. Under the Revenue Act of 1918, 40 Stat. 1097, which contained the same phrase, the regulations construed it to include cases in which the decedent "pays the premiums, either directly or indirectly."[1] In 1930, probably because of a supposed implication of the decision in Chase National Bank v. United States, 278 U.S. 327, 49 S.Ct. 126, 73 L.Ed. 405, 63 A.L.R. 388, which sustained the validity of the tax under the in-

cidents of ownership test, that test was adopted by the Treasury Department for the first time as the sole criterion of taxability.[2] A later regulation,[3] however, while re-introducing the premium test, retained the test of whether the decedent "possesses any of the legal incidents of ownership" as one of three alternatives. In 1937 this triple alternative test was eliminated and the incidents of ownership test reinstated.[4] That was the test recognized by the Treasury Department until January 10, 1941, when probably relying on Bailey v. U. S., Ct.Cl., 27 F.Supp. 617, by T.D. 5032 it again adopted the payment of premiums as the single factor determining taxability.

T.D. 5032 reads in part as follows:

"The term 'insurance' refers to life insurance of every description, including death benefits paid by fraternal beneficial societies operating under the lodge system. Insurance receivable by beneficiaries other than the estate is considered to have been taken out by the decedent *where he paid, either directly or indirectly, all the premiums* or other consideration wherewith the insurance was acquired, whether or not he made the application. Such insurance is not considered to have been so taken out, even though the application was made by the decedent, if no part of the premiums or other consideration was paid either directly or indirectly by him." (Italics added).

"The amount in excess of $40,000 of the aggregate proceeds of all insurance on the decedent's life not receivable by or for the benefit of his estate must be included in his gross estate as follows:

"(1) To the extent to which such insurance was taken out by the decedent upon his own life (see article 25) after January 10, 1941, the date of Treasury Decision 5032."

The regulations contain for purposes of illustration an "example" which indicates that the extent to which insurance was taken out by decedent after January 10, 1941, is that proportion of the total insurance payable which the amount of premiums paid by him after that date bears to the total amount of premiums paid.

That amendment (T.D. 5032) was later embodied in Articles 81.25 and 81.27 of Regulations 105 under which the Commissioner treated the insurance here in ques-

---

[1] Reg. 37 (1921 ed.) Arts. 32, 34-5. See also Reg. 63, Art. 27, Reg. 68, Art. 25.

[2] T.D. 4296.

[3] Reg. 80 (1934 ed.) Art. 25.

[4] Reg. 80 (1937 ed.) Art. 25.

tion as included in the gross estate. An amendment of the statute in 1942 embodied the premium test precisely as adopted in Regulations 105 but that amendment was expressly made prospective only. 56 Stat. 944, 945, 26 U.S.C.A. Int.Rev.Code § 811(g).

The decedent owning the insurance died in April, 1941, before the 1942 amendment. It is stipulated that in 1938 she "relinquished all the incidents of ownership" in the policies and this I must assume to include the right to change beneficiaries, to surrender the policies for their cash value or to otherwise surrender or revoke, and any reversionary interest. Nothing to the contrary appearing, I must also assume that the policies were taken out after the passage of the Act of 1918. The government seeks to include in her gross estate that proportion of the total amount of insurance payable which the premiums paid by the decedent after January 10, 1941, bear to the total premiums paid on those policies.[5] The question whether Regulations 105 are valid and effective in requiring such proportion to be included in the gross estate solely because the decedent paid premiums thereon is thus squarely presented.

■■ Where a statute is ambiguous, as here, it is proper for the courts to give consideration to administrative regulations in aid of construction. Walker v. United States, 8 Cir., 83 F.2d 103, 106. The old rule of construction to the effect that when Congress by reenactment conforms the text of a statute with an administrative regulation construing it, it impliedly recognizes that the regulation correctly reflected the earlier legislative intent, is of little help where after the original enactment the regulations have undergone a complete metamorphosis while the statute has been blissfully reenacted by Congress.[6] The fact that the statute was reenacted without express adoption of the ownership test while that test was in effect under the regulations does not mean that that administrative construction became so embedded in the law that a later regulation could not revert to the original construction. Helver-

ing v. Reynolds, 313 U.S. 428, 432, 61 S.Ct. 971, 85 L.Ed. 1438, 134 A.L.R. 1155. Some weight may be given, however, to the fact that the 1942 amendment of the Act adopted precisely the test set forth in T.D. 5032. True, the statute was carefully made non-retroactive, but this may well have been due to the fact that the $40,000 exemption was also removed.

■ The questions for decision, therefore, are whether the construction of the pertinent section of the Revenue Act of 1926 adopted in Regulations 105, Articles 81.25 and 81.27, is valid and whether the statute so implemented is constitutional.

The language of the statute is broad enough to support such a construction. The Circuit Court of Appeals for the Second Circuit has said:

"The language of Section 302(g) [7] is of the broadest kind. It in terms includes in the gross estate of a decedent amounts receivable by all other beneficiaries. Only because of regulations and certain judicial decisions has Section 302(g) not been extended to cases where the insured has retained no interest in a policy taken out on his own life. *As an original question, even such a policy might have been thought to fall within Section 302(g) because of its inherent testamentary character.*" (Italics added.) Chase National Bank v. U. S., 116 F.2d 625, 627. See also Broderick v. Keefe, 1 Cir., 112 F.2d 293, 295.

This observation, though by way of dictum only for purposes of that case, is directly supported by Bailey v. U. S., Ct.Cl., 27 F.Supp. 617.[8] I accept the observation as sound and hold that the language of the Act has sufficient breadth to support Regulations 105.

If, then, the language of the Act has sufficient breadth to support the Regulations, as I hold, is there any suggestion of a Congressional intent that the language should not be given its full scope? I see none. Broadly viewed, the Revenue Act was designed to produce revenue. In its original form and in its successive modifications, it discloses innumerable provi-

---

[5] No mention having been made of the $40,000 exemption, it is assumed that that exemption has been allowed as to this or other insurance.

[6] See I Paul, Federal Estate and Gift Taxation, 522.

[7] Of the Revenue Act of 1926, 44 Stat. 71, 26 U.S.C.A. Int.Rev.Acts, page 231.

[8] Subsequently two rehearings were granted and decisions rendered on other grounds. 30 F.Supp. 184, 31 F.Supp. 778. Certiorari dismissed on stipulation. 311 U.S. 721, 60 S.Ct. 1107, 85 L.Ed. 470.

sions designed to close loopholes in its basic structure which might be used to diminish its revenue-producing capacity. To construe any particular provision to have a scope less than the language warranted would run contrary to this continuing and pervasive intent. And, as already observed, with particular reference to Section 302(g) the successive reenactments of the same language is no more indicative of a legislative intent to restrict the scope of the section to the area covered by the "incidents of ownership test" than to the broader area covered by the "premium test".

Perhaps more plausible is the argument that it is not sensible to impute to Congress an intent to include within the scope of an estate tax a transfer of legal interests which, in a case such as this, where the decedent had no right of reverter, appears to have been a completed transaction inter vivos. This argument, however, neglects the testamentary aspects of transactions involving life insurance policies, the characteristic noted in the passage from the opinion in the Chase National Bank case quoted above. The same thought was developed in Bailey v. United States, Ct. Cl., 27 F.Supp. 617, at page 621, in the following language:

"Life insurance is inherently testamentary in character. The payment of premiums and the insured's death are the necessary events giving rise to the full and complete possession and enjoyment of the face amount of the policies by the beneficiary. The acquisition of life-insurance policies on one's own life is a substitute for a testamentary disposition of property, and to allow an insured to avoid the estate tax upon his estate by making an assignment of policies taken out by him, and upon which he paid the premiums at a time when the statute required the inclusion of the proceeds of such policies in his gross estate, would be contrary to the clear language of the statute. Compare Burnet v. Wells, 289 U.S. 670, 53 S.Ct. 761, 77 L.Ed. 1439."

The thought is susceptible of further development. But first it should be noted that the problem here is not concerned with insurance intended and effective for the protection and personal benefit only of the insured; we are concerned here with insurance taken out for the benefit and protection of others than the insured. In practical effect that objective can be as well accomplished by the transfer of an insurance policy to the beneficiary named therein as by a legacy under a will. In a broad sense a life insurance policy represents an investment acquired by installment payments over a period of years which is analogous to a portfolio of securities which a decedent may have accumulated during his life-time by outright purchase, piece by piece, and which is available for transfer inter vivos or by will. And the one investment is as well adapted as the other for devotion to the benefit and protection of selected beneficiaries. In either form the full benefit of the investment accrues to the beneficiary only on the death of the decedent.

An absolute assignment of such a policy even where as here there is no possibility of reverter to the assured, does not destroy the essential testamentary quality of the transaction. To be sure, since such an assignment lacks the ambulatory quality of a will, the immediate effect is to confer a greater benefit upon the beneficiary than accrues to a named legatee upon the execution of a will. Such a beneficiary may become entitled to the cash surrender of the policy[9] and thus have something of value which may be assigned or pledged. Nevertheless, the value thus acquired is substantially less than the amount of the policy payable in cash upon the death of the assured. And this residuum of value, like the value of a testamentary disposition, accrues only at the death of the assured. This incident of the transaction may well have been in the mind of the court when in Tyler v. U. S., 281 U.S. 497, 503, 50 S.Ct. 356, 359, 74 L. Ed. 991, 69 A.L.R. 758, it indicated that the test of constitutional taxability is not whether there has been in the strict sense a "transfer" but "whether the death has brought into being or ripened for the survivor, property rights of such character as to make appropriate the imposition of a tax upon that result." (Italics added.) See also Paul, Vol. I, p. 525. It thus appears that it was by no means inappropriate for Congress to include this section of the Act, which has such a strong testamentary savor, under that title of the Revenue Act which provides for the imposition of an estate tax.

---

[9] It will be noted that the assignment of a fully paid policy is necessarily beyond the reach of the "premium test," and is not involved in the problem here.

There are other cases also which disclose judicial language and reasoning which tends to corroborate my estimate of the breadth of the Congressional intent.

In Lang v. Commissioner, 304 U.S. 264, 58 S.Ct. 880, 82 L.Ed. 1331, 118 A.L.R. 319, the Supreme Court held includible certain portions of the proceeds of insurance purchased in a state where community property laws prevented decedent from exercising his reserved right to change beneficiaries. The implication of this decision would seem to be that the payment of premiums is in itself sufficient to bring the policies within the operation of the statute.

Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368, arose under § 302(c) of the Revenue Act of 1926, but the decision "by parity of reasoning" throws light upon the proper construction of § 302(g) of that Act which is applicable here. Broderick v. Keefe, 1 Cir., 112 F.2d 293, 296. In that opinion, the Supreme Court indicated the path to be followed by courts striving for a sound and uniform taxing principle when, referring to its decision in Klein v. United States, 283 U.S. 231, 51 S.Ct. 398, 75 L.Ed. 996, it said (309 U.S. at page 112, 60 S.Ct. at page 448, 84 L.Ed. 604, 125 A.L.R. 1368):

"The inescapable rationale of this decision, rendered by a unanimous Court, was that the statute taxes not merely those interests which are deemed to pass at death according to refined technicalities of the law of property. It also taxes inter vivos transfers that are too much akin to testamentary dispositions not to be subjected to the same excise. By bringing into the gross estate at his death that which the settlor gave contingently upon it, this Court fastened on the vital factor."

The cases most commonly cited in support of a narrower construction of the statute are either not in point or overruled.

In Bingham v. United States, 296 U.S. 211, 56 S.Ct. 180, 80 L.Ed. 160, the Supreme Court had before it policies issued before the Act of 1918—a vital point of difference from the situation here. To the extent that the holding excluding the proceeds of the policies from the gross estate

was based upon the ground that no legal interest was left by the prior assignment to pass upon the decedent's death, it relied on Helvering v. St. Louis Union Trust Co., 296 U.S. 39, 56 S.Ct. 74, 80 L.Ed. 29, 100 A.L.R. 1239, and Becker v. St. Louis Union Trust Co., 296 U.S. 48, 56 S.Ct. 78, 80 L.Ed. 35, which in turn were expressly overruled by Helvering v. Hallock, supra. Thus this doctrine of the Bingham case also was in effect overruled. Chase National Bank v. United States, 1 Cir., 116 F.2d 625.

In Chase National Bank v. U. S., 278 U. S. 327, 49 S.Ct. 126, 127, 73 L.Ed. 405, 63 A.L.R. 388, the decedent in assigning an insurance policy had reserved the power to change the beneficiary. The court sustained the inclusion of the insurance proceeds under the "incidents of ownership" test. There was no occasion for the court to consider whether the statute was susceptible of a broader construction. Indeed the court said: "In the present case there is no question of the construction of the statute." [10]

The holding in Walker v. U. S., 8 Cir., 83 F.2d 103, and Helvering v. Parker, 8 Cir., 84 F.2d 838, may be traced, I think, to a misinterpretation of the Bingham case apparently overlooking the fact that in the Bingham case all the rights of the insured had been relinquished *prior to the passage of the statute.*

Helburn v. Ballard, 6 Cir., 85 F.2d 613, contains a brief per curiam opinion also relying upon the Bingham case and Industrial Trust Company v. United States, 296 U.S. 220, 56 S.Ct. 182, 80 L.Ed. 191, In Pennsylvania Company v. Commissioner, 3 Cir., 79 F.2d 295, cert. den. Helvering v. Pennsylvania Co., 296 U.S. 651, 56 S.Ct. 310, 80 L.Ed. 463, often cited in support of the proposition that some retention of the incidents of ownership is necessary to render life insurance policies includible in the gross estate, the government apparently did not contend that the policies would be taxable in the absence of such interest in the decedent.

I therefore conclude that I should accord to the statute a construction as broad as that implicit in Regulations 105.

■ The plaintiff, however, asserts that Section 302(g) of the Act, if construed to

---

[10] After this decision, most courts construed the statute with an eye to what they understood to be its constitutional limitations, and it is therefore impossible to segregate cleanly in the cases questions of construction from questions of constitutionality.

have the breadth covered by Regulations 105, is unconstitutional as applied to policies such as those here involved which had been irrevocably transferred with a complete divesting of all incidents of ownership prior to the date of the Regulations. The assertion, however, is sustained neither by citation of authority nor by argument. It is, I think entirely without foundation.

Certainly the statute cannot be said to be invalid as imposing a direct tax on property. The constitutionality of the gift tax on transfers inter vivos has been sustained. Bromley v. McCaughn, 280 U.S. 124, 50 S. Ct. 46, 74 L.Ed. 226, O'Connor v. Anderson, 2 Cir., 28 F.2d 873, Anderson v. McNeir, 2 Cir., 16 F.2d 970. The constitutionality of the estate tax on transfers of a legal interest passing on death has also been sustained. N. Y. Trust Co. v. Eisner, 256 U.S. 345, 41 S.Ct. 506, 65 L.Ed. 963, 16 A.L.R. 660. There is thus little room to question the constitutionality of a tax on the transfer of the rights under insurance policies upon the life of the insurer—a hybrid type of transfer in which incidents of transfers inter vivos and transfers upon death are blended.

In Chase National Bank v. United States, 278 U.S. 327, 49 S.Ct. 126, 73 L.Ed. 405, 63 A.L.R. 388, it was held that the application of the Act of 1921 to the proceeds of insurance policies assigned subject to a right of reverter to the insured (decedent) did not offend the constitution as constituting a direct tax on property. The same conclusion is required when the Act is applied to such an assignment without reverter or possibility of reverter: the differences in other aspects of the transaction are not such as to transform an excise tax into a direct tax.

Any contention that the Act is unconstitutional as offending the Fifth Amendment is equally untenable. If the broad construction which I put upon the Act is sound, when the decedent took out the policies and assigned them she assumed the liability to taxation imposed by the statute as it then stood. However, any hardship which may have resulted from her reliance upon the "incidents of ownership" test in force under the regulations when she made her assignment is equitably mitigated by the apportionment feature of Regulations 105 whereby only that part of the insurance proceeds is includible in her gross estate which may be, at least roughly, attributed to the premiums paid by her after the premium test by its incorporation into Regulations 105 became effective to control the enforcement activities of the Treasury Department. Bailey v. United States, Ct.Cl., 27 F.Supp. 617. Cf. Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 56 S.Ct 70, 80 L.Ed. 62.

As my earlier discussion shows, even in a case such as this there is a residuum of value over and above the cash surrender value of the policy passing to the beneficiary on the assignment which is transferred from the insurer to the beneficiary at the death of the insured. That this final transfer of value, which as already pointed out savors of a testamentary transfer, derives directly from the insurer and only indirectly from the insured, is unimportant; it is in effect "the transfer of property procured through expenditures by the decedent." Chase Nat. Bank v. United States, 278 U.S. 337, 49 S.Ct. at page 128, 73 L.Ed. 405, 63 A.L.R. 338. That the inclusion of such a transfer at least in part under the apportionment feature of the Regulations, is a provision well adapted to prevent avoidance of the estate tax is obvious. Its validity is sustained in principle in Milliken v. United States, 283 U.S. 15, 20, 51 S.Ct. 324, 75 L.Ed. 809, and United States v. Wells, 283 U.S. 102, 116, 51 S. Ct. 446, 75 L.Ed. 867.

The Commissioner was correct in including in the gross estate that portion of the proceeds of the policies indicated by Regulations 105.

The government has withdrawn its defense to the plaintiff's claim that the remainder interest in the trust securities was not includible. The plaintiff as executor of the estate of Gertrude B. Whittemore is entitled to recover so much of the deficiency assessment as resulted from the increase in valuation of the stock and from the inclusion of the value of the remainder interest.

The plaintiff as executor of the estate of Justine B. Whittemore is entitled to recover so much of the deficiency assessed against that estate as resulted from the increase in valuation of the stock.

Plaintiff's counsel may submit for entry in each case a judgment giving effect to the foregoing rulings which will be settled in chambers, on notice, unless notice shall be waived.