**GOSS et al. v. FITZPATRICK, Collector of Internal Revenue et al.**

Civ. No. 2688.

United States District Court, D. Connecticut.

April 10, 1951.

Curtiss K. Thompson of Thompson, Weir & MacDonald, New Haven, Conn., for plaintiffs.

James P. Garland, Special Asst. to Atty. Gen., Edward J. Lonergan, Asst. U. S. Dist. Atty., Hartford, Conn., for defendants.

SMITH, District Judge.

Memorandum of Decision.

This is an action brought by the executors of the estate of John H. Goss for the recovery of $38,390.47 with interest, a portion of the Federal estate taxes paid as a

result of claimed overvaluation by the Commissioner of Internal Revenue of voting-trust certificates for 1900 shares of common stock of the Alden M. Young Company. The Collector valued the stock as being worth, on October 16, 1944, the date of the decedent's death, $106 per share, arrived at by dividing the stipulated market value of the assets of the Alden M. Young Company, less the amount of the outstanding preferred stock, by the total number of shares of common stock outstanding.

Statute and Regulations Involved.

Internal Revenue Code.

"§ 811. Gross estate.

"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated * * *.

\* \* \* \* \* \*

"(k) Valuation of unlisted stock and securities. In the case of stock and securities of a corporation the value of which by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." 26 U.S.C.A. § 811.

Treasury Regulations 105, relating to the estate tax under the Internal Revenue Code:

Sec. 81.10. Valuation of Property.

(a) General.—The value of every item of property includible in the gross estate is the fair market value thereof at the time of the decedent's death; * * * The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. The fair market value of a particular kind of property includible in the gross estate is not to be determined by a forced sale price. Such value is to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property. For example, in the case of shares of stock or bonds such unit of property is a share or a bond. All relevant facts and elements of value as of the applicable valuation date should be considered in every case.

(c) (1) The value of stocks and bonds, within the meaning of the Internal Revenue Code, is the fair market value per share or bond on the applicable valuation date.

(c) (6) If actual sales or bona fide bid and asked prices are not available, then, in the case of * * * shares of stock, upon the basis of the company's net worth, earning power, dividend paying capacity, and all other relevant factors having a bearing upon the value of the stock. Among such other relevant factors to be considered are the values of securities of corporations engaged in the same or similar line of business which are listed on an exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case * * *.

The value of the underlying assets appears to have been the basis of the Collector's valuation, although a recalculation at the time of trial shows that the amount which would be distributed to the common stockholders upon liquidation of the company at that date (October 16, 1944) would be approximately $107 per share.

The record does not support such a market value for the voting-trust certificates. The plaintiffs introduced expert evidence, in the opinion of the witness Jones, that the fair market value of such voting-trust certificates would approximate 50% of the asset value underlying the certificates, in the case of minority holdings in this family holding company or investment trust. The principal assets of the trust are marketable securities valued at $1,518,156.39 and real estate of the fair market value of $312,301. The company, however, which was formed in 1912 to manage the assets of the estate of Alden M. Young has

shown relatively poor asset value appreciation, earning capacity, and dividend-paying record as well as a relatively high expense ratio over the years immediately preceding and including the date of death of the decedent, John H. Goss.

It is established that the securities of representative investment trusts, with comparatively better standings in these respects, were selling on October 16, 1944, at substantial discounts below the liquidating value of the securities underlying the stock of those investment trusts. Without more, in view of those prevailing market conditions, a discount from the market value of underlying assets of 35%, because of the indirect ownership of the underlying assets, is not unreasonable. Jones also applied a discount of 10% because of what he considered the lack of marketability of the minority stock in view of the fact that it was closely held, unlisted and subject to the voting-trust agreement. He applied a further discount of 5% in view of the possibility that a substantial portion of the assets might have to be sacrificed at unfavorable market prices in cases of demand by the preferred stockholders, brought about by their individual tax situations at any time, for redemption by the company of the preferred stock. These two discounts are based on factors which must be considered and which undoubtedly do exist in this picture. They may separately be composed in part of some of the unfavorable factors taken into consideration in arriving at the 35% indirect-ownership factor. However, valuation on a basis of capitalization of 5 years' average earnings supports an even greater total discount, as pointed out by Jones.

Taking into account the probable overlapping to some extent of the discount factors used by Jones, the stipulated values of the underlying assets, the earning record and the other factors mentioned, a fair market value of the voting-trust certificates appears to the Court to be $60 a share.

The defendants offer no countervailing evidence of market value but contend for a valuation on the basis of underlying values rather than market values of the voting-trust certificates. In spite of the market value requirement and need for consideration of earning record and other factors to comply with the statute and regulations, they contend that such a valuation method as proposed by them is justified and necessary in order to avoid leaving a loophole for escape of a substantial proportion of estate and gift taxes through the creation of closely-held family investment companies whose shares rather than the underlying securities would be subject to valuation for tax purposes. There is, of course, no claim that the Alden M. Young Company was created for any such purposes for it has existed since prior to the original income tax and gift tax laws and was created for legitimate purposes of conserving a financially embarrassed estate without any thought of tax effects.

Moreover, it may be doubted whether it would be of any great advantage to the taxpayer to tie up investments in such a manner as this, to incur the expenses of running such investment companies and the disadvantages of a form of operation which has resulted in so poor a record for this company over a substantial period prior to the tax date in question here.

If the form of investment company or trust is such that its advantages outweigh its disadvantages, pointed out in the testimony here, that fact would naturally be reflected in the fair market value of the securities of the investment company or trust. There are periods when equity ownership of an investment trust represents advantages reflected by market values of its securities greater than the aggregate market value of its assets.

Were these voting-trust certificates valued at such a period as 1928 or early 1929 we could expect such a result.

We cannot change the rule of valuation in defiance of the statute and regulations merely because the incidence of the tax occurs at a period when the statutory method is relatively more favorable to the taxpayer. cf. Colonial Trust Co. v. Kraemer, D.C.D.Conn.1945, 63 F.Supp. 866.

Form of judgment for the plaintiff, in accordance herewith may be submitted on notice.

768

### Findings of Fact.

1. This is a civil action which arises under the laws of the United States of America providing for internal revenue in that it seeks the recovery of monies representing federal estate taxes assessed and collected by the defendants as Collectors of Internal Revenue for the District of Connecticut.

2. The plaintiff, John B. Goss is a resident of the City of Waterbury, County of New Haven and State of Connecticut. The plaintiff Milton W. Goss is a resident of the Town of Branford, County of New Haven and State of Connecticut. The plaintiff The Citizens and Manufacturers National Bank of Waterbury is a corporation duly organized and existing under the laws of the United States of America, with its principal office located in the City of Waterbury, County of New Haven and State of Connecticut.

The plaintiffs were named executors under the last Will and Testament of John H. Goss who, prior to his death, resided in the City of Waterbury, County of New Haven, and State of Connecticut; they accepted said appointment, duly qualified in the Probate Court for the District of Waterbury, and are still acting in that capacity.

3. The defendant Frank W. Kraemer was Collector of Internal Revenue for the District of Connecticut from March 1, 1944 to April 14, 1948. The defendant John J. Fitzpatrick has been Collector of Internal Revenue for the District of Connecticut since July 23, 1948 and still is such Collector.

4. Said John H. Goss died on the 16th day of October, 1944, and on said date he was the owner of voting-trust certificates for 1900 shares of the common stock of The Alden M. Young Company (hereinafter referred to as the "Young Company"), a corporation organized and existing under the laws of the State of Connecticut, with principal offices in the Town of Branford, in said State.

5. The plaintiffs duly filed the Federal Estate Tax Return for said estate and paid the tax shown upon said return to the defendant Frank W. Kraemer, as Collector of Internal Revenue for the District of Connecticut, on or about January 14, 1946. In determining the value of the said estate and in ascertaining and fixing the amount of tax payable thereon, the plaintiffs used $50 per share as the value of each share of the said common stock of the Young Company and the sum of $95,-000 as the aggregate value of the voting-trust certificates for 1900 shares.

6. Subsequently the Commissioner of Internal Revenue determined that the value of such voting-trust certificates should be One Hundred and Six Dollars ($106) per share, and the said Commissioner also determined that other adjustments should be made, as a result of which the said Commissioner of Internal Revenue notified the plaintiffs of a deficiency in the federal estate tax due from the said estate in the amount of Thirty-Two Thousand Nine Hundred Fifty-two and 34/100 Dollars ($32,952.34).

7. On or about September 30, 1948, the plaintiffs paid to the defendant John J. Fitzpatrick, as Collector of Internal Revenue for the District of Connecticut, the sum of Fifteen Thousand Dollars ($15,000) as a payment on account of said deficiency, and on or about November 3, 1948, the plaintiffs paid to the defendant John J. Fitzpatrick as Collector of Internal Revenue for the District of Connecticut, the sum of Twenty-three Thousand Three Hundred Ninety and 47/100 Dollars ($23,-390.47) as a payment on account of said deficiency and of interest thereon.

8. On or about January 10, 1949 the plaintiffs filed with the defendant John J. Fitzpatrick, as Collector of Internal Revenue for the District of Connecticut, a claim for refund.

9. The Commissioner of Internal Revenue did not render any decision on the Claim for Refund before the expiration of six months from the date of filing such claim.

10. The Young Company was incorporated on or about March 21, 1912, with a capital stock of $2000 consisting of 80 shares having a par value of $25 per share. The corporation was inactive until 1917 when the capital stock was increased to

$268,000 consisting of 2680 shares having a par value of $100 per share. In August, 1918, the authorized capital stock was increased to $500,000 and in April, 1924, to $750,000. In 1926, capitalization of the company was changed to $750,000 of common stock. In 1929 the capital of the company was again increased to $2,250,000 consisting of 7500 shares of preferred stock having a par value of $750,000 and 15,000 shares of common stock having a par value of $1,500,000 and a dividend of one share of preferred stock and an additional share of common stock for each old share of common stock owned was declared.

11. A voting-trust agreement covering all of the common stock of the Young Company was entered into on April 2, 1917. This agreement is as follows:

This Agreement, made this second day of April 1917, between the holders of capital stock of The Alden M. Young Company, a corporation of Connecticut, who shall become parties to this agreement by signing the same, hereinafter called the "Subscribers", parties of the first part, and John H. Goss of Waterbury, Connecticut, and M. J. Warner and H. M. Whiting, both of Branford, Connecticut, hereinafter called the "Voting Trustees", parties of the second part.

### Witnesseth:

That said parties, each in consideration of the agreement of the other and of the sum of One Dollar each to the other in hand paid, agree as follows:

1. Each of the subscribers agrees that he will forthwith deposit with the Voting Trustees a certificate or certificates for his shares of capital stock in said Company, together with a proper and sufficient assignment thereof to the Voting Trustees;

2. Upon such deposit, the Voting Trustees will deliver to said subscriber, or order, their voting trust certificate or certificates for the same number of shares, which certificates shall be substantially in the following form:

The Alden M. Young Company.

No.......... Shares ..........

#### Voting Trust Certificate

This Certifies That on the day of 191 ....................................... will be entitled to receive a certificate or certificates for ............ shares of One Hundred dollars ($100) each, of the Capital stock of The Alden M. Young Company, and in the meantime, to receive payments equal to the dividends, if any, collected by the Voting Trustees hereinafter mentioned upon a like number of said shares, and until after the actual delivery of such certificate the Voting Trustees shall in respect to any and all such stock, possess and be entitled to exercise all stockholder's rights of every kind, including the right to vote and to take part in or consent to any corporate or stockholder's action; it being expressly stipulated that no right to vote or take part in or consent to any corporate or stockholder's action passes by or under this certificate or by or under any agreement, express or implied.

This certificate is issued under and pursuant to, and the rights of the holder are subject to and limited by the terms and conditions of a certain agreement dated the second day of April 1917, between the subscribing holders of the capital stock of said Company and John H. Goss, M. J. Warner and H. M. Whiting, as Voting Trustees, copies whereof are filed with the said Company and with said Trustees. No stock certificate shall be due or deliverable hereunder before the first day of April 1922, except according to the terms of said agreement, and by the terms thereof the date of such delivery may be postponed. This certificate is transferable on the books of the Voting Trustees by the registered holder hereof, in person or by attorney, upon surrender of this certificate properly endorsed, and until so transferred the Voting Trustees may treat the registered holder as the owner hereof for all purposes whatsoever.

In Witness Whereof the Voting Trustees have signed this Certificate, or caused same to be signed, in their names and behalf, by their duly authorized agent, this day of 19

3. Said Voting Trustees shall have the power to appoint as their agent an individual or corporation, and upon the appointment of such agent no voting trust certificates shall be valid without the counter-signature of such agent.

4. Said voting trust certificates shall be transferable as provided on their face and not otherwise, and transfers so made shall vest in the transferee all right and interest of the transferor therein, but until such transfer, the Voting Trustee may treat the registered holder of such certificate as the owner thereof for all purposes whatsoever.

5. The delivery to the Voting Trustees, as above provided for, of certificates of capital stock shall absolutely divest each stockholder, so depositing of and from all right and interests in the said stock (and in said corporation save as expressed in said voting trust certificate) and shall vest in the Trustee all and every right which the depositor had up to the time of delivery.

6. Until the distribution of the stock, so deposited the holder of each voting trust certificate shall be entitled to receive from time to time payments equal to the dividends, if any, collected by the Voting Trustees upon a like number of shares of capital stock of said corporation.

7. This voting trust shall continue for a period of five years from the 2nd day of April 1917, at the expiration of which time it shall, unless terminated or continued as hereinafter provided, automatically terminate, and upon the termination thereof the Voting Trustees shall redeem the voting trust certificates by delivering to the holders thereof shares of capital stock in said corporation of equal face value.

8. Said voting trust may be terminated prior to said date by a vote of the holders of all of said voting trust certificates, and may be so continued for an additional period or periods not to exceed 5 years each upon a vote of the holders of three-quarters in amount of said voting trust certificates.

9. In case of death, resignation, or disability of any of said Voting Trustees, a successor shall be appointed by the remaining Trustees, but in the event of a vacancy in the office of Two Trustees or that two Trustees are unable to agree upon a successor, then, and in either of said events, and upon such failure for sixty days to act, such vacancy may be filled by a vote of a majority in interest of the owners of voting trust certificates.

10. All questions arising among the Voting Trustees shall be determined by the decision of a majority of them. The Voting Trustees may, in all matters, act either at meetings or by writing without meetings. Meetings may be held by waiver, on four days notice by mail, or two days notice by telegraph and, without notice, if all are present. If majority action be had by writing without meeting, the full text of such action shall forthwith be mailed to the other Voting Trustee and no such action shall be effective until three days after such mailing.

11. In the event that it is deemed expedient for the holders of voting trust certificates to act as a body on the question of the termination or continuance of the trust, or for the purpose of filling a vacancy among the Trustees, such action shall be taken at a meeting duly warned by ten (10) days notice in writing by the Voting Trustees, or a majority of them, or by the holders of ten (10) percent in value of said voting trust certificates; said meeting to be held either at Branford or Waterbury, unless the place of meeting be changed by resolution of the Voting Trustees. Said notice shall be mailed to the registered address of the voting trust certificate holders. At any meeting the holders of voting trust certificates shall have one vote for each share of stock represented by such certificates, which vote they may exercise in person or by proxy;

12. Any Voting Trustee may at any time resign by delivering to the other Voting Trustees or Trustee his resignation in writing;

13. A Voting Trustee appointed to fill a vacancy shall be fully imbued with the estate, title, rights and powers of a Voting Trustee hereunder by the delivery to him by the remaining Voting Trustees of notice of his appointment, or by the delivery to

him of such notice by the person acting as Secretary of a meeting of the voting trust certificate holders;

14. No Voting Trustee shall be liable for any error of judgment or mistake of law or other mistake or for anything save his own unlawful misconduct or gross negligence.

15. This agreement may be executed in parts of like form each of which shall be deemed to be an original and taken together shall constitute one and the same instrument.

In Witness Whereof, the said parties have hereunto set their hands and seals the day and year first above written.

John H. Goss
M. J. Warner
H. M. Whiting
Voting Trustees

## SUBSCRIBING STOCKHOLDERS

| Name | Address | Number of Shares |
| --- | --- | --- |
| Ellen A. Young | Pine Orchard, Conn. | 1950 |
| Olive Young Warner | "       "       " | 234 |
| Ella Young Goss | Waterbury, Conn. | 234 |
| Lucy Young Smith | "       " | 60 |
| Elizabeth Young Gallaudet | "       " | 60 |
| John H. Goss | "       " | 69 |
| M. J. Warner | Pine Orchard, Conn. | 69 |
| H. M. Whiting | "       "       " | 1 |

Said agreement was extended from time to time pursuant to its terms and was in effect on the date of the decedent's death.

12. The Certificate of Incorporation of the Young Company as amended and in effect on October 16, 1944 contained the following provision with respect to the capital stock of the company:

"That the amount of capital stock of said corporation hereby authorized is $2,250,000 divided into 7,500 shares of preferred stock of the par value of $100 each and 15,000 shares of common stock of the par value of $100 each. The holders of preferred stock shall be entitled to non-cumulative dividends at the rate of 5% per annum, payable quarterly or otherwise at the discretion of the Board, before any dividend is paid on the common stock of the company: provided, however, that at any time during a fiscal year in which the preferential dividends have been paid or set aside, dividends may be declared and paid on the common stock up to $2.50 per share, after which the preferred stock shall participate with the common stock in the ratio of 1% per share to the preferred stock and 50¢ per share to the common stock until the preferred stock shall have received a total of 7% per share and no more for any one fiscal year, and such participating dividends on the preferred stock may be paid in cash or in like preferred stock or scrip representing same at time of option of the Directors; and provided that the Directors may set aside in reserve the entire 7% for the preferred stock and the corresponding $3.50 per share on the common stock and declare dividends from such reserve at such intervals, as to each class of stock, as may be determined by the Board from time to time. The Directors shall have full power and authority, in their discretion, in each year and from time to time to set up and accrue to depreciation, amortization or to other reserves and to working capital or other special funds such sums as they deem advisable before arriving at the net surplus of the Company for any year, and in the absence of active fraud, any sum so set aside by the Directors before arriving at the net surplus shall be forever discharged from any claim by Preferred stockholders for dividend purposes and no Preferred stockholder shall have the right to claim any interest in the earnings, profits or sur-

772

plus of this Corporation as dividends unless and until the same has been declared as dividends payable to such Preferred stockholder. The directors shall have the further right in their discretion to create a Preferred Stock Retirement Fund by setting aside from time to time, such sums as they deem wise from the net surplus, arrived at as aforesaid, provided that no such accruals shall be made while the Fund, principal and income, equals the then outstanding par value of the Preferred stock and no part of such Fund shall be used for any purpose other than the retirement of Preferred stock until such Preferred stock shall have been retired when the balance of such Fund shall be turned into the general treasury of the Company, provided that said fund may be resorted to in satisfaction of any unsatisfied judgment against the Corporation. Said Fund may be invested by the Board in any manner it sees fit, entirely relieved from any law in regard to the investment of Trust Funds. In liquidation, whether by call of the stock or otherwise, the holders of Preferred stock shall be entitled to be paid the par value thereof and any declared and unpaid dividends and any earned and undeclared preferential dividends for the elapsed portion of the fiscal year, if any, next preceding such liquidation. The Preferred stock shall be callable at any time and from time to time by vote of the Board upon one month's written notice to the addresses of the stockholders as recorded on the books of the company and such calling rights shall attach to each and every share separately and each share may be called without regard to any other share and without regard to how many shares may be held by any stockholder at the date of such call and without regard to the number of shares represented by any certificate or certificates and, in the event that less than the entire amount of stock is called at any time, the matter of which shares are called shall be in the sole discretion of the Board. After the date set for retirement of any Preferred stock, such stock shall be entitled to no further dividends and to no interest upon the callable value thereof and upon the deposit by the Corporation, to the order of the stockholder, in any Bank or Trust Company in Con-

necticut of the callable value of such stock the Corporation shall be forever discharged from any liability in regard to the stock so called and the stockholders rights, if any, shall be solely against the amount so deposited. Each stockholder shall have the right, upon thirty days written notice addressed to the Corporation at its principal place of business, to require the retirement of any or all of his Preferred stock and the Directors shall accept such demands, which shall have the effect of calling such stock for retirement at the next dividend date, subject to all of the foregoing provisions in regard to a call at the initiative of the Board. Any Preferred stock which has been retired as hereinabove provided for shall be subject to reissue and any retirements made from time to time shall not diminish the amount of authorized Preferred stock. There shall be no retirement of Preferred stock which would render the Company insolvent. In the case of any retirement of Preferred stock, whether upon the initiative of the Board or of the stockholders, the Directors shall have the right, in their discretion, to retire said stock by the payment of cash or by the delivery from the Treasury of the Company of securities at their then market value or by both cash and securities. The said market value of any securities delivered as aforesaid shall be determined by a written appraisal signed by a majority of the Board."

13. On the date of the decedent's death there were 5,134 shares of preferred stock of the Young Company and 13,518 shares of its common stock outstanding as follows:

| | Voting Trust Certificates for Common | Preferred |
|---|---|---|
| The Citizens and Manufacturers National Bank of Waterbury and Emily M. Goss, Trustee under agreement with John B. Goss dated February 25, 1941, Trust # 694 | — | 100 |
| Elizabeth Y. Gallaudet | 2172 | 1338 |

| | Voting Trust Certificates for Common | Preferred |
|---|---|---|
| Olive Young Warner | 1932 | 1358 |
| Elizabeth Warner Allen | 90 | 65 |
| Milton Pierpont Warner | 80 | 60 |
| M. J. Warner | 2 | 1 |
| H. M. Whiting | — | 1 |
| John H. Goss | 1900 | — |
| Lucy Young Smith | 2122 | 1213 |
| Birch Warner Hincks | 90 | 44 |
| Alden Y. Warner | 80 | 40 |
| Elizabeth Goss Wild | 50 | 325 |
| Milton W. Goss | 50 | 325 |
| Clare Smith Noyes | 50 | 38 |
| John B. Goss | 50 | — |
| Ellen G. Fabian | 50 | 25 |
| The Olive Young Warner Trust | 1600 | — |
| The Lucy Young Smith Trust | 1600 | — |
| The Elizabeth Y. Gallaudet Trust | 1600 | — |
| Conn. Public Service Corp. | — | 198 |
| Estate of Hebert D. Gallaudet | — | 1 |
| Sidney W. Noyes, Jr. | — | 1 |
| John M. Hincks | — | 1 |
| | 13,518 | 5,134 |

14. On October 16, 1944 the assets and liabilities of the Young Company consisted of the following, having the fair market values set forth:

### Assets

| | |
|---|---|
| Cash | $6,177.37 |
| Notes Receivable | 200.00 |
| Accounts Receivable | 98,299.65 |
| Accrued Interest | 277.82 |
| Materials, crops, supplies | 3,960.70 |
| Mortgage notes | 32,310.00 |
| Stocks and Bonds | 1,518,156.39 |
| Real Estate | 312,201.00 |
| Equipment | 1,953.29 |
| Furniture | 5,411.02 |
| Prepaid Insurance | 1,428.73 |
| | $1,980,375.97 |

### Liabilities

| | |
|---|---|
| Accounts Payable | $ 1,286.60 |
| Notes Payable | 19,000.00 |
| | $ 20,286.60 |

Excess of Assets over Liabilities .................... $1,960,089.37

15. The item listed in Paragraph 14 as "Stocks and Bonds" was made up of the stocks and bonds listed in Exhibit C, annexed to the Stipulation of the parties filed in this case.

On October 16, 1944, these stocks and bonds were of the fair market values stated in Exhibit C.

16. The item listed in Paragraph 14 as "Real Estate" comprises the properties listed in Exhibit D, annexed to the Stipulation by the parties in this case.

On October 16, 1944, they had the fair market value set forth therein.

17. During the years 1939 to 1944, both inclusive, the net earnings of the Young Company, after the payment of federal income taxes and after exclusion of non-recurrent capital gains and losses, and before dividends on either the preferred or common stock were as follows:

| Year | Amount |
|---|---|
| 1939 | $58,035.14 |
| 1940 | 49,837.10 |
| 1941 | 68,720.67 |
| 1942 | 21,011.69 |
| 1943 | 23,159.90 |
| 1944 | 22,931.25 |

18. During the years 1939 to 1944, both inclusive, the Young Company paid annual dividends of $5 per share on the preferred stock outstanding, totalling $35,831.25 in the year 1939, $26,367.50 in the year 1940, and $25,670. in each of the years 1941 to 1944, both inclusive.

19. During the years 1939 to 1944, both inclusive, the Young Company paid the following dividends on its common stock:

| Year | Amount Per Share | Total Dividends Paid |
|---|---|---|
| 1939 | $2.00 | $27,036.00 |
| 1940 | 2.00 | 27,036.00 |
| 1941 | 2.50 | 33,795.00 |
| 1942 | 2.00 | 27,036.00 |
| 1943 | 2.00 | 27,036.00 |
| 1944 | 2.00 | 27,036.00 |

20. The fair market value of the voting trust certificates for the common stock of the Alden M. Young Company on October 16, 1944 was $60 per share.

### Conclusions of Law.

1. The Court has jurisdiction of the parties and of the subject matter of the action.

2. The proper value for estate tax purposes, to be placed upon voting trust certificates representing the stock of a family corporation is the fair market value of the voting trust certificates at the date of evaluation.

3. Plaintiffs are entitled to judgment for the portion of the amount of tax paid because of the valuation of shares of the Alden M. Young Company at a value in excess of $60 per share.