## FORD v. KAVANAUGH, Collector of Internal Revenue.

No. 11090.

United States District Court.
E. D. Michigan, S. D.

Nov. 7, 1952.

464

Lewis & Watkins, Detroit, Mich., for plaintiff.

Roger P. O'Connor, Asst. U. S. Atty., Detroit, Mich., for defendant.

PICARD, District Judge.

Plaintiff, as executor, commenced this action for refund of taxes which his father's estate was compelled to pay from the proceeds of certain insurance policies in' which the father, Emory L. Ford, was the insured and plaintiff and his stepmother (Prudential) or plaintiff alone(Connecticut) were the beneficiaries.

Findings of Fact

Most of the essential findings of fact follow, but there will be other findings discussed in the conclusions of law, omitted herein so as not to require repetition. One main fact common to the policies in question is that Emory L. Ford, the father, died December 20, 1942 and that three policies of the Prudential Insurance Company of America are involved in one issue and two policies of the Connecticut Mutual Life Insurance Company involved in the other questions presented.

The Prudential Policies

On June 24, 1926, Hazel Hopkins Ford, wife of decedent, purchased from the Pru-

dential two insurance policies on' the life of her husband, Emory L. Ford,—one for $100,000, the other for $400,000. On June 28, 1930 the $100,000 policy was amended by inserting an accidental death benefit provision and on September 9, 1930, this policy was split into two $50,000 policies.

In all three policies the beneficiaries were Hazel Hopkins Ford and Emory M. Ford, wife and son of deceased, share and share alike or the survivor thereof.

The policies contained two important provisions:

First, there was the usual clause that:

"If there be no beneficiary living at the death of the Insured the amount of insurance shall be payable to the executors, administrators or assigns of of the Insured unless otherwise provided in the Policy."

and a rider reciting that:

"It is specially agreed that all dividends, benefits, and advantages to be had or derived from this Policy shall belong to the Beneficiaries hereunder and not to the Insured."

Right to change beneficiaries was not granted the insured.

Several years prior to application for the above policies decedent had given his wife various income bearing and earning securities which were outright gifts to her with no provisions, conditions or limitations attached thereto. From the funds obtained she paid the premiums on all Prudential policies. Then on February 15, 1933 a property settlement was consummated between decedent and Hazel Hopkins Ford, his wife, which was followed by a divorce later.

On March 6, 1933, Hazel Hopkins Ford executed an absolute assignment of all her interests in the Prudential policies to Emory M. Ford, the son, who thereafter made all annual premium payments until the death of decedent. This assignment included

"all dividends now due and which may hereafter accrue thereon, and all benefit and advantage to be had or derived therefrom;"

and is further discussed in the conclusions of law under "As To 3".

The tax taken from the Prudential policy funds centers on the seven years of premium payments made by the wife from 1926 through 1932, the pro rata part of which was assessed to Emory L. Ford's estate on the theory herein later discussed.

### Conclusions of Law

Since Emory L. Ford died December 20, 1942, plaintiff may recover the tax levied on the Prudential policies if he is able to prove one of three things:

1. That the premiums were not paid either directly or indirectly by Emory L. Ford, whose estate was charged; or

2. That there was no reversionary interest for the benefit of Emory L. Ford in the policies; or

3. That if there was such a reversionary interest it did not have a value after January 10, 1941, in excess of 5 per cent of the value of the policies. Internal Revenue Code, § 811(g)(2)(A), 26 U.S.C.A. § 811(g)(2)(A); Sec. 404(c) Rev.Act of 1942 and Section 503(a) Rev.Act of 1950; 26 U.S.C.A. § 811 note.

### As To 1

█ The first question above is admittedly one of fact. Also admittedly, those premiums were paid out of funds that came to Mrs. Ford, the wife, as income from stocks and bonds that had been given her by her husband three to seven years before she ever took out the Prudential policies. Although Congress indicated that it desired the above section strictly construed when it stated in S.Rep. No. 1631, 77th Cong., 2nd Sess. p. 235, 1942–2—Cum.Bull. 504, 676–677:

> "Payments of premiums or other consideration by the decedent include payments made by him directly or indirectly. This provision is intended to prevent avoidance of the estate tax and should be construed in accordance with this objective. For example, if the decedent transfers funds to his wife *so that she* may purchase insurance on his life, and she purchases such insurance, the payments are considered to have been made by the decedent even though they are not directly

traceable to the precise funds transferred by the decedent." (Emphasis ours.)

it is nevertheless advisable to note the words:

> " * * * if the decedent transfers funds to his wife *so that she* may purchase insurance on his life * * *" (emphasis ours).

So even rigidly construed the fact remains that those stocks and bonds were given to Mrs. Ford years before the Prudential insurance policies were purchased. They couldn't have been given *"so that she"* might purchase insurance on Emory L. Ford's life and therefore on this contention the plaintiff has proven his case. True, the testimony of the wife would have been desirable but the defendant was in as good a position as plaintiff—if not better—to have submitted her evidence. The fact that the husband supervised manipulation of the wife's finances, could draw checks on his wife's bank account and bought other stocks for her, does not change the picture. That is very often done where the husband has business experience and the wife has none, and in the absence of some special control of the fund itself, not apparent here, such facts do not destroy the other evidence before us. Here the financial secretary of the Ford finances and investments drew the checks but the liability to pay the premiums was hers and the money that paid the premiums came from her account.

The government argues that the property settlement agreement of February 15, 1933 between Emory L. Ford and his wife, by which she was released from an earlier arrangement to pay premiums on certain listed insurance policies on the life of her husband, should be considered. But when we analyze that fact it is more in favor of plaintiff than for defendant. The Prudential policies are not even mentioned in that agreement and their exclusion is evidence that they weren't intended to be, since certain other insurance policies were included. But even if the agreement had specifically included the Prudential policies, the stocks had been originally given to her in years previous and did not contain any

restrictions. It was her money to bargain with as she desired.

No case has been cited by defendant to the contrary but in Estate of Cain, 1941, 43 B.T.A. 1133 the court passed on the same question to the effect that premium payments by the wife could not be attributed to the husband merely because he had given her some property some time ago and as in the case at bar all the premium money came from such funds. See also Saunders' Estate, 1950, 14 T.C. 534 and Harvey v. United States, 7 Cir., 1950, 185 F.2d 463, 467.

In the latter case the court, after considering the novel proposition that all income produced by gift property, after the gift has been made final and without strings, still belongs to the donor, said:

"* * * income produced by property of any kind belongs to the person who owns the property at the time it produces such income and does not originate with a donor who has made a completed gift of that property prior to its production of the income."

In Estate of Showers, 1950, 14 T.C. 902 suggested by defendant, the question never reached the higher court because the case was settled before it got there after a District Judge had ruled for the government on contention similar to the point raised in the case at bar. But there were other issues presented so that case is not an authority.

We decide, therefore, that the premiums were paid by the wife and not directly or indirectly through the husband, and very properly we could end this opinion here, had not the plaintiff requested this court's conclusions on the second and third questions.

## As To 2

■ The second question relates to whether or not there was a reversionary interest in the estate of the deceased.

When the policies were first taken out the rider clause, referred to in the findings of fact, was attached. Plaintiff contends that all rights deceased had were cancelled by that rider, citing New York Life Insurance

Company v. Dunlevy, 9 Cir., 1914, 214 F. 1, 6, where the insured using language quite similar to the Prudential rider in the case at bar, had assigned to his daughter a policy on his life. In that case, the daughter sought to collect from the insurance company the sum of $2,479.70 that insured would be entitled to if living on January 22, 1909. In its defense the company claimed that the assignment did not convey the "tontine" rights to the daughter, and it was held that Gould had surrendered all his rights when he executed the assignment. The court after citing its provisions, to-wit:

"* * * and all the dividend, benefit and advantage to be had or derived therefrom."

went on to say:

"Language more apt could not have well been selected to transfer absolutely the whole interest of the insured in the policy".

We believe the New York Life Insurance Company v. Dunlevy, supra, decision is out-moded (1914) when applied to the case at bar because it cannot be denied that if the son and wife had died before Emory L. Ford, he (Emory L. Ford) had a reversionary interest, and if the beneficiary or beneficiaries had not taken any of the benefits from the policies, the entire amount would have been practically intact for him.

It is not what they might have done but what they actually did as the Supreme Court has so often held ever since the New York Life Insurance Company v. Dunlevy, supra, decision. It's the situation at the moment of decedent's death which controls even though such interest might have disappeared prior to insured's death if the son or wife had exercised the powers given to them. In Goldstone v. United States, 325 U.S. 687, 65 S.Ct. 1323, 1326, 89 L.Ed. 1871, the court stated:

"But the imposition and computation of the estate tax are based upon the interests in actual existence at the time of the decedent's death. It follows that only those events that actually occurred prior to that moment can be considered in determining the exist-

ence and value of the taxable interests. Events that might have but failed to take place so as to erase a decedent's reversionary interest must be ignored; such unrealized possibilities, if significant at all, only add to the remoteness of the reversionary interest."

See also Fidelity-Philadelphia Trust Co. v. Rothensies, 324 U.S. 108, 65 S.Ct. 508, 89 L.Ed. 782; Chase National Bank v. United States, 2 Cir., 116 F.2d 625; Broderick v. Keefe, 1 Cir., 112 F.2d 293; Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L. Ed. 604.

The rationale of what we believe the intention of the parties was when the extension clause was added was simply an attempt to take away from the father such rights as old age contribution, pensions, disability payments, cash surrender and perhaps other rights that the insured would have had from the inception of the policy without the rider clause. Not the reversionary interest, because where would the proceeds of the policy have gone if both the son and wife had died before the father? Certainly they would have gone to the father's estate. Otherwise the extension of beneficiary rights would have specifically included the words "reversionary interests."

We hold that the father had a reversionary interest.

## As To 3

■ The third issue raised by the Prudential policies relates to whether or not any reversionary interest that might exist was at least 5 per cent of the value of the policies and since this court has found that there was reversionary interest, then the question becomes important only in the event we are reversed and it is later held by a higher court that the premiums came either directly or indirectly from funds of the decedent.

Here the effect of the assignment by Mrs. Ford to Emory M. Ford, son of the decedent, is the deciding factor since it has been stipulated that if the reversionary interest of decedent depended upon the death of both his wife and his son prior to his own death, such reversionary interest would

be less than 5 per cent but if it was governed by death of the son only, the reversionary interest would be more than 5 per cent.

Here the plaintiff presents a rather specious and strained series of reasons, and he makes much of the fact that when the father died one-half of these policies were paid to the son as "beneficiary" and the other half paid him as "assignee of his stepmother." Neither the government nor the court can be swayed by what might have been the reasoning of someone in the insurance company's office as to why this was done and certainly the son would raise no objection to the company's conclusion as long as he got the full sum of the policies, which he did. It wasn't necessary for him to wait until his stepmother died. It appears to us that when Mrs. Ford made this assignment to Emory M. Ford, which happened in the same year—perhaps at the same time—the divorce agreement was made out, all her interest in those policies was gone. The insurance company could at that time have issued a new policy if necessary naming the son alone as beneficiary but it recognized the assignment and the money was paid to the son when the father died.

No cases have been cited by either side on this point. It is just plain reasoning and in our opinion reversionary rights depended solely upon the death of the son and not on the death of the son and wife. This gives it more than a 5 per cent value as per the stipulation and our conclusions reached in the above "As To 2". We were not impressed by the expert's testimony on the value of those reversionary rights.

Our conclusion, therefore, on the Prudential policies is that plaintiff is entitled to recover because of the first ground but not because of the other two. We hold that there were reversionary rights regardless of the rider; that the value of the reversionary rights was more than 5 per cent because of the assignment from the mother to the son but that the premiums were paid by the wife from her own account and not directly or indirectly from the funds of decedent.

Plaintiff will recover the amount of the tax.

### Findings of Fact on the Connecticut Policy

On April 25, 1908, decedent, Emory L. Ford, purchased from Connecticut Mutual Life Insurance Company a $50,000, twenty-year pay life policy and named Emory M. Ford, his son, sole beneficiary. On June 28, 1921, after payment of 14 premiums, decedent gratuitously assigned all of his right, title and interest in that policy to his son, Emory M. Ford, who thereafter from his own funds paid the remaining 6 premiums. The assignment was as follows:

" * * * It is expressly understood and agreed that this transfer is made for the purpose of divesting the assignor of all title to and interest in said Policy or the proceeds thereof and of vesting the absolute and unconditional title thereof in said Assignee."

In 1933 Emory M. Ford on his sole signature cashed in this policy and received $31,125.50. Using these funds he purchased the two policies in question from the Connecticut Company on the life of his father, Emory L. Ford, one an annuity by which he, Emory M. Ford, was to and did receive $934.55 yearly during the life of decedent. The other was on the life of decedent in the amount of $29,643.00 payable to himself, Emory M. Ford, if he survived the insured, if not, to the said insured's executors, administrators or assigns, or, if the insured survived to the end of said term, (38 years) then to Emory M. Ford, if he was living, if not, to the insured, or his assignee.

No medical examination of decedent was required. However, the life insurance policy would not have issued on the decedent unless the son had simultaneously paid for and obtained the annuity contract. Both policies were for single premiums amounting to $31,125.50. Upon the death of the decedent the proceeds of the life insurance policy were paid to Emory M. Ford less an estate tax.

### Conclusions of Law

■ The government, taxing 70 per cent of the Connecticut Mutual policy, does so by virtue of either Section 811(c) or 811(g) of the Code.

It is our opinion that Section 811(g) does not apply because the proceeds of the policy must be receivable as insurance and under the case of Helvering v. LeGierse, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996, decided in 1941, it was held that since there was no risk assumption by the insurance company the proceeds could not be treated as insurance.

In the LeGierse case there were two policies, one an annuity and the other straight life with no medical examination required. Then, too, if Section 811(g) applies then the same debatable provisions covering the Prudential policies would be presented, and since we held in the Prudential policies that the premiums were not paid by the decedent, we would also hold here that the premiums were paid by the son and not by the father.

■ Under Section 811(c)(1)(C) the government must show that:

(1) the decedent intended the transfer to take effect, in possession or enjoyment, at or after his death, *and*

(2) he retained a reversionary interest, and

(3) such reversionary interest was worth more than 5 per cent of the transferred property immediately before his death.

■ We are unable to follow the government's reasoning at any place in the Connecticut Mutual policy issue because of these facts. The father, in 1908, purchased a twenty-year pay life policy in the sum of $50,000 on which he paid premiums for fourteen years himself. Then in 1921 his assignment to his son was absolute and at the end of six years the son, having made the remaining payments, was the owner of that policy in toto. Emory L. Ford had nothing more to do with that policy. Emory L. Ford was out. There were no strings attached to the son's right to the money. All reversionary rights retained by the father in the 1908 policy were lost when the son cashed that policy in 1933.

Then, on July 26, 1933, the son made what he thought was a prudent investment. He got two policies, one on his father's life and the other an annuity payable to himself at so much a year. There was a reversionary possibility for the father; but not "retained" by him; on the contrary it "was given" to him.

True, the son did talk over this investment with his father the same as the wife did when getting the Prudential policies, but unless it has become an evidence of ownership in the father or the husband for either a son or wife to talk over financial matters involving their own funds with the father, this evidence is of no consequence. Talking over business affairs between husband and wife or father and children should be encouraged rather than discouraged. The son bought the policies and the original gift certainly was not made in contemplation of death, as is required under the section involved. Nor was there any contemplation of death involved as far back as 1908.

We hold for the plaintiff on all three issues and believe he is entitled to a return of the tax paid on the Connecticut policy.

### Conclusion

A judgment in accordance with this opinion may be submitted for our signature.