ESTATE OF CLARENCE H. LOEB, DECEASED, BESSIE ROBINSON LOEB, ISIDORE ROBINSON AND HARRY ROBINSON, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60154. Filed October 11, 1957.

*Morris J. Oppenheim, Esq.*, for the petitioners.
*John F. Walsh, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined a deficiency in estate tax in the amount of $5,339.15 and made an addition to the tax for failure to file a return within the time prescribed by law (sec. 3612 (d), I. R. C. 1939) in the amount of $266.96. Only one of the Commissioner's adjustments is contested. We must decide whether the premiums on life insurance policies on the life of the decedent were indirectly paid by the decedent and the insurance proceeds are thus includible in his gross estate under section 811 (g) (2) (A). If we hold that the insurance proceeds are so includible, then we must further decide whether section 811 (g) (2) (A) is unconstitutional in its application in this case.

### FINDINGS OF FACT.

Most of the facts are stipulated. The stipulated facts and pertinent exhibits are found as stipulated and are incorporated herein by reference.

The estate tax return was filed with the director of internal revenue for the district of Brooklyn, New York.

Clarence died August 25, 1951. He was survived by his wife, Bessie, and three sons.

On March 30, 1941, Bessie, as "applicant," and Clarence, as the proposed insured, made application to the Prudential Insurance Company

of America for insurance on the life of Clarence. On April 21, 1941, Prudential issued policy number 11–495–009 in the face amount of $30,000 on the life of Clarence. This policy is hereinafter referred to as the Prudential policy. Bessie was the primary beneficiary of the Prudential policy and a rider attached to the policy provided that all legal incidents of ownership and control of the policy belong to her. Annual premiums on the Prudential policy were $974.40 for the first 3 years and $1,137.30, thereafter.

On April 5, 1941, Bessie, as "applicant," and Clarence, as the proposed insured, made application to the John Hancock Mutual Life Insurance Company of Boston, Massachusetts, for insurance on the life of Clarence. On April 14, 1941, John Hancock issued policy number 3457518 in the face amount of $10,000 on the life of Clarence. This policy is hereinafter referred to as the John Hancock policy. Bessie was the primary beneficiary and on subsequent endorsements to the policy was referred to as its owner. Annual premiums on the John Hancock policy were $366.20.

On April 21, 1941, Bessie, as "applicant," and Clarence, as the proposed insured, made application to the Home Life Insurance Company for insurance on the life of Clarence. On that day, Home Life issued policy number 484,543 in the face amount of $10,000 on the life of Clarence. This policy is hereinafter referred to as the Home Life policy. Bessie was the primary beneficiary of this policy and the policy provided specifically that Bessie, in the place and stead of the owner, was the owner of the policy. Annual premiums on the Home Life policy were $343.70.

On April 18, 1941, Bessie opened a checking account in the United National Bank of Long Island upon which only she had authority to draw. Bessie's opening deposit in the account was $2,000 which was given to her by Clarence. On the day she opened the account she drew three checks totaling $1,684.30 to pay the initial premiums on the Prudential, Home Life, and John Hancock policies. Subsequent premium payments to the insurance companies with respect to the above policies were made by checks drawn upon this account. Over 95 per cent in amount of the deposits to Bessie's checking account had their source in checks drawn by Clarence on his own personal checking account.

The following schedules show the source of the deposits and the nature of the withdrawals, with respect to Bessie's checking account at the United National Bank, from the date the account was opened to the date of Clarence's death:

SOURCE OF DEPOSITS

| Year | Clarence | Other | Total |
|---|---|---|---|
| 1941 | $3,300 | $121.00 | $3,421.00 |
| 1942 | 1,000 | | 1,000.00 |
| 1943 | 2,450 | 146.99 | 2,596.99 |
| 1944 | 2,100 | 250.00 | 2,350.00 |
| 1945 | 2,637 | 230.55 | 2,867.55 |
| 1946 | 4,000 | | 4,000.00 |
| 1947 | 500 | | 500.00 |
| 1948 | 5,300 | 200.00 | 5,500.00 |
| 1949 | 3,000 | | 3,000.00 |
| 1950 | | 200.00 | 200.00 |
| 1951 | 2,500 | | 2,500.00 |
| | 26,787 | 1,148.54 | 27,935.54 |

NATURE OF WITHDRAWALS

| Year | Insurance premiums | Other | Total |
|---|---|---|---|
| 1941 | $1,684.30 | $52.87 | $1,737.17 |
| 1942 | 1,684.30 | 106.23 | 1,790.53 |
| 1943 | 1,684.30 | [1] 1,552.37 | 3,236.67 |
| 1944 | 2,213.40 | [2] 1,125.00 | 3,338.40 |
| 1945 | | | |
| 1946 | 1,847.20 | 251.74 | 2,098.94 |
| 1947 | 1,847.20 | 416.33 | 2,263.53 |
| 1948 | 1,847.20 | 843.58 | 2,690.78 |
| 1949 | 1,847.20 | 1,292.74 | 3,139.94 |
| 1950 | 1,847.20 | 1,075.05 | 2,922.25 |
| 1951 | 1,847.20 | 214.88 | 2,062.08 |
| | 18,349.50 | 6,930.79 | 25,280.29 |

[1] Includes $1,000 paid to decedent.
[2] Used to purchase bonds.

Subsequent to the death of Clarence, the proceeds of the Prudential, the Home Life, and the John Hancock policies, in the respective amounts of $30,000, $10,000, and $10,000, were paid to Bessie. She also received $2,340.72 in accumulated dividends on the Prudential policy. The above-mentioned insurance proceeds were listed in Schedule D of Clarence's estate tax return, but they were not included in his gross estate for estate tax purposes. The stated reasons for such treatment were that the policies "were owned by Bessie R. Loeb, she made the application for the policies and paid all premiums due thereon."

The insurance proceeds paid to Bessie, under the Prudential, the Home Life, and the John Hancock policies, all of which were upon the life of Clarence, were purchased with premiums paid indirectly by Clarence, the decedent.

OPINION.

Insofar as this case is concerned, section 811 (g) (2) (A) of the Internal Revenue Code of 1939 [1] provides that the value of the gross

[1] Section 811 (g) (2) (A) was enacted under section 404 (a) of the Revenue Act of 1942. Section 404 (c) of that Act (Pub. L. 753, 77th Cong., 2d Sess.) provided that the amendments made by subsection (a) were applicable only to estates of decedents dying after the date of enactment of the Act; but in determining the proportion of the premiums paid directly or indirectly by the decedent, the amount so paid by the decedent on or before January 10, 1941, should be excluded if at no time after that date the decedent possessed any incidents of ownership in the policy.

estate of the decedent shall include the proceeds of life insurance to the extent of the amount receivable by all beneficiaries, other than the executor, as insurance under policies upon the life of the decedent purchased with premiums, or other consideration, paid *indirectly* by the decedent in proportion that the amount so paid by the decedent bears to the total premiums paid for the insurance.

The petitioner contends that under the estate tax regulations[2] only those premium payments which are made with funds transferred for the purpose of paying premiums, pursuant to an arrangement which requires that the funds be used for that purpose, can be considered to be indirect premium payments by the decedent. Accordingly, the petitioner argues, since Bessie's uncontradicted testimony was to the effect that the funds given to her by Clarence were gifts with which she could do as she pleased, and since she paid the premiums with checks drawn on her personal checking account, then Clarence did not indirectly pay the premiums on the policies on his life within the meaning of the statute and the regulations. As authority, the petitioner cites *Estate of John E. Cain, Sr.*, 43 B. T. A. 1133 (1941), and *Ford* v. *Kavanaugh*, 108 F. Supp. 463 (E. D. Mich., 1952).

We think the petitioner's interpretation of the regulations is too narrow. They specifically provide that the phrase "paid indirectly by the decedent" is intended to be broad in scope. The latter interpretation is consistent with the legislative history of the so-called payment of premiums provision for including insurance proceeds in the decedent's gross estate. House Report No. 2333, section 404, 77th Cong., 2d Sess., p. 162, 1942–2 C. B. 372, 491, states that the provision was "intended to prevent avoidance of the estate tax and should be construed in accordance with this objective." See *Estate of Albert Dudley Saunders*, 14 T. C. 534 (1950), where we held that payments of insurance premiums from a joint bank account, which was made up almost exclusively of funds furnished by the decedent, were indirectly paid by the decedent, except to the extent it was shown they were paid out of funds which were his wife's separate property prior to deposit in the joint checking account; and *Estate of E. A. Showers*, 14 T. C. 903 (1950), where we held that payments of insurance premiums by decedent's wife, with income derived by the wife from property transferred to her by the decedent, were indirectly paid by the decedent.

---

[2] Section 81.27 (a), Regs. 105, as amended by T. D. 5239, 1943 C. B. 1081, 1092, provides in part:

The purchase of insurance upon the life of the decedent is attributed to the decedent even though the premiums, or other consideration, are paid only indirectly by the decedent. As thus used, the phrase "paid indirectly by the decedent" is intended to be broad in scope. For example, if the decedent transfers funds to his wife so that she may purchase insurance on his life, and she purchases such insurance, the payments are considered to have been made by the decedent even though they are not directly traceable to the precise funds transferred by the decedent. * * *

Whether Clarence indirectly paid the premiums on the insurance policies on his life, which were owned by Bessie, is a question of fact. *Estate of Julius Selling*, 24 T. C. 191 (1955), on appeal (C. A. 2). And in spite of Bessie's testimony that she could do whatever she pleased with the funds given to her by Clarence, we think the record taken as a whole can support only one finding—that Clarence indirectly paid the premiums on the policies on his life owned by Bessie.

Bessie opened her personal checking account on April 18, 1941. At that time she deposited $2,000, which she had received from Clarence. On the same day, she drew three checks totaling $1,684.30 to pay the initial premiums on the John Hancock policy which was issued on April 14, 1941, and the Prudential and Home Life policies which were issued on April 21, 1941.

During the period April 18, 1941, to August 25, 1951, Bessie deposited $27,935.54 in her personal checking account, of which $26,787 was given to her by Clarence. During that same period she drew checks on the account totaling $25,280.29, of which $18,349.50 was used to pay premiums on the three policies in question. And during the first 6½ years she had the account, Bessie withdrew only $1,379.54 from the account for miscellaneous personal expenses—an average of about $210 per year.

Bessie's testimony, standing alone, cannot overcome the irresistible conclusion to be drawn from an analysis of the transactions which took place in Bessie's personal checking account from the day it was opened, until the day Clarence died. We think that the underlying purpose of the transfer of funds from Clarence to Bessie, which she deposited in her personal checking account, was to enable her to pay the premiums by a circuitous method, ostensibly out of her own separate funds. We hold that Clarence indirectly paid the premiums on the insurance policies on his life which were owned by Bessie. The insurance proceeds are therefore includible in Clarence's gross estate under section 811 (g) (2) (A).

The cases cited by the petitioner in support of its position are factually distinguishable. In both the *Cain* and *Ford* cases the decedents had given their wives substantial amounts of income-producing property several years prior to application and issuance of the insurance policies in question. The premium payments were made by the wives from the property obtained from the decedents which clearly had not been given to them for the purpose of purchasing insurance on the decedents' lives.

The petitioner argues alternatively that section 811 (g) (2) (A) is unconstitutional because it imposes a direct tax on the proceeds of life insurance, which is unapportioned, as required by article I, section

2, clause 3, and article I, section 9, clause 4 of the Constitution,[3] citing *Kohl* v. *United States*, 226 F. 2d 381 (C. A. 7, 1955), as authority for its position. The arguments are substantially the same as those advanced by the Court of Appeals in its opinion. The petitioner also argues alternatively that section 811 (g) (2) (A) is unconstitutional because it is an arbitrary and unreasonable discrimination against life insurance and thus violates the due process clause of the Fifth Amendment to the Constitution.

In the *Kohl* case, the decedent procured three insurance policies upon his life in 1921 and 1922 and paid the annual premiums thereon prior to December 29, 1940. On January 21, 1941, he assigned all his rights in the policies to his three children and paid a gift tax on the assignments. All premiums on the policies accruing subsequent to the assignment were paid by the assignees. On September 18, 1943, the decedent died. The Commissioner included the insurance proceeds, proportionate to the premiums paid by the decedent, in the gross estate under section 811 (g) as amended by section 404 of the Revenue Act of 1942, and determined a deficiency in estate tax which was paid by the executors. A suit for refund followed. The District Court held that the proceeds were not includible in the decedent's gross estate because the payment of premiums provision of section 811 (g) was unconsititutional. *Kohl* v. *The United States*, 128 F. Supp. 902 (E. D. Wis., 1954). On appeal, the decision was affirmed. The Court of Appeals reasoned that since the decedent divested himself of all incidents of ownership in the insurance during his life, there was no transfer of property rights in and to the policies at the decedent's death and therefore the tax upon the insurance was not an indirect tax upon the transfer of the insurance, but was a direct tax upon the proceeds of the insurance, which was unconstitutional under article I, sections 2 and 9, of the Constitution, because it was unapportioned. The court reasoned further that since the decedent had completely assigned his interest in the insurance policies and had paid a Federal tax thereon prior to the Revenue Act of 1942, which first explicitly introduced the premium payments provision for taxing life insurance to the estate of the insured, then taxing the insurance to the decedent's estate was retroactive and so arbitrary and capricious that its enforcement would amount to a deprivation of property without due process of law as required under the Fifth Amendment to the Constitution.

We have carefully considered the decision of the Seventh Circuit

---

[3] ARTICLE I.
SECTION 2.
\* \* \* \* \* \* \*
Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, \* \* \*
SECTION 9.
\* \* \* \* \* \* \*
No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.

in the *Kohl* case, and its application as a precedent in the problem which confronts us. With all due respect for the Seventh Circuit, we think its holding that section 811 (g) (2) (A) imposes a direct tax on insurance, is erroneous, and we therefore decline to follow it. See *Arthur L. Lawrence*, 27 T. C. 713 (1957), on appeal (C. A. 9).

In examining an act of Congress, in order to determine its constitutionality, we must be guided by the well settled rule that every intendment is in favor of its validity. It must be presumed to be constitutional unless its repugnancy to the Constitution clearly appears. *Buttfield* v. *Stranahan*, 192 U. S. 470, 492 (1904). This is particularly true of a revenue act of Congress, since the power to tax is one of the great powers upon which the whole national fabric is based. *Nicol* v. *Ames*, 173 U. S. 509, 515 (1899). Taxation is eminently practical, and for the purpose of deciding its validity, a tax should be regarded in its actual, practical results. *Nicol* v. *Ames*, *supra*.

Section 811 (g) (2) (A) taxes life insurance to the estate of a decedent, even though he possessed no incidents of ownership in the insurance at his death, to the extent that he paid premiums for the insurance. Therefore, we think it is clear that the subject of the tax under that section is the inter vivos transfer of that part of the insurance purchased by the decedent and thus the conclusion in the *Kohl* case, that section 811 (g) (2) (A) imposes a direct tax upon insurance proceeds, is erroneous. See 1 Paul, Federal Estate and Gift Taxation (1942) sec. 10.15, and Lowndes and Kramer, Federal Estate and Gift Taxes (1956) ch. 12, sec. 6.

The question for decision thus becomes, "May Congress, under the estate tax, tax insurance proceeds, paid as a result of the decedent's death, to the decedent who indirectly paid the premiums on such insurance during his life, but did not possess any incidents of ownership in the insurance at his death, or at any other time?"

The petitioner argues that Congress may only impose an estate tax on an event which takes place at the death of the decedent—a transfer of property or shifting of economic benefits from the decedent to the beneficiary. The petitioner relies primarily upon the language of the Supreme Court in *Knowlton* v. *Moore*, 178 U. S. 41 (1899), *Chase Nat. Bank* v. *United States*, 278 U. S. 327 (1929), and *Heiner* v. *Donnan*, 285 U. S. 312 (1932), as support for its position.

In *Knowlton* v. *Moore*, *supra*, at 56, the Supreme Court said:

[The tax rests, in essence,] upon the principle that death is the generating source from which the particular taxing power takes its being and that it is the power to transmit, or the transmission from the dead to the living, on which such taxes are more immediately rested.

In *Chase Nat. Bank* v. *United States*, *supra*, at 334, the Supreme Court said:

The statute in terms taxes transfers. Like provisions in earlier acts have been generally upheld as imposing a tax on the privilege of transferring the property of a decedent at death, measured by the value of the interest transferred or which ceases at death.

In *Heiner* v. *Donnan, supra*, at 322, the Supreme Court said: "The thing taxed is the transmission of property from the dead to the living. It does not include pure gifts *inter vivos*."

Although the language quoted above seems to support the position taken by the petitioner, we think it is an incomplete statement of the law as it has developed. The decisions themselves offer no support for the petitioner. *Knowlton* v. *Moore, supra*, upheld the constitutionality of a tax on legacies which existed during the Spanish-American War. *Chase Nat. Bank* v. *United States, supra*, held that where a decedent retained until his death, the right to change the beneficiaries of insurance policies on his life, the termination of his power of disposition by death, whereby the transfer of the insurance proceeds was completed, was the legitimate subject of a transfer·tax. *Heiner* v. *Donnan, supra*, held that a conclusive presumption that transfers within 2 years of the transferor's death were in contemplation of death, was so arbitrary and capricious that it violated the due process clause of the Fifth Amendment. None of the above cases held that it was unconstitutional to tax inter vivos transfers under the estate tax.

It is well settled that Congress has the power to lay an excise upon all inter vivos gifts. *Bromley* v. *McCaughn*, 280 U. S. 124 (1929). And it is of no significance that such tax is denominated an estate tax or is found in a statute purporting to levy an estate tax, so long as the classification of such gifts is not unreasonable or arbitrary. *Helvering* v. *Bullard*, 303 U. S. 297 (1938). Furthermore, it is not unreasonable or arbitrary to tax inter vivos gifts under the estate tax if such transfers are substitutes for testamentary dispositions, *Milliken* v. *United States*, 283 U. S. 15 (1931), or if such tax is reasonably related to preventing avoidance of the estate tax. *Tyler* v. *United States*, 281 U. S. 497 (1930) ; *Helvering* v. *City Bank Co.*, 296 U. S. 85 (1935) ; *Helvering* v. *Bullard, supra*. See also *Helvering* v. *Hallock*, 309 U. S. 106, 112 (1940), where the Supreme Court, commenting on its decision in *Klein* v. *United States*, 283 U. S. 231 (1931), said:

The inescapable rationale of this decision, rendered by a unanimous Court, was that the statute taxes not merely those interests which are deemed to pass at death according to refined technicalities of the law of property. It also taxes *inter vivos* transfers that are too much akin to testamentary dispositions not to be subjected to the same exercise. * * *

The petitioner's final argument is that to single.out life insurance and subject it to the estate tax under rules not applicable to other

forms of property is completely arbitrary and unreasonable and therefore violates the due process clause of the Fifth Amendment.

This argument, however, ignores the fact that life insurance is inherently different in character from other types of property. As was said in *Bailey* v. *United States*, 27 F. Supp. 617, 627 (Ct. Cl., 1939):

Life insurance is inherently testamentary in character. The payment of premiums and the insured's death are the necessary events giving rise to the full and complete possession and enjoyment of the face amount of the policies by the beneficiary. The acquisition of life-insurance policies on one's own life is a substitute for a testamentary disposition of property * * *

We pointed out above that it is not unreasonable or arbitrary to tax inter vivos gifts under the estate tax so long as the tax is reasonably related to preventing avoidance of the estate tax. And we think that section 811 (g) (2) (A) is a reasonable measure for Congress to take in order to prevent avoidance of the estate tax by an inter vivos transfer of life insurance where the insured has paid one or more of the premiums on such insurance. H. Rept. No. 2333, sec. 404, *supra*.

The various sections of the estate tax dealing with transfers in contemplation of death, transfers taking effect at death, revocable transfers, etc., and the Federal gift tax, provide adequate protection against inter vivos transfers of ordinary property made to avoid estate taxes. However, this is not so as to life insurance, because of its inherent characteristics. For example, the gift tax is not a deterrent to an insured's making an irrevocable inter vivos gift of life insurance policies on his life, because the replacement cost of an insurance policy (which is probably the best available criterion of its value for purposes of the gift tax, *United States* v. *Ryerson*, 312 U. S. 260 (1941)) is usually much less than the face amount of the insurance policy, thus the gift tax on the transfer will be negligible. Furthermore, unless the premiums on the policy are unusually large, they may be paid by the insured subsequent to the irrevocable transfer without incurring additional gift taxes because of the annual exclusion of $3,000 provided for by section 1003 (b) of the gift tax. And since life insurance is usually bought for the purpose of protecting dependents after death, the insured's lifetime enjoyment, which consists of the satisfaction derived from the realization that his dependents have the protection of insurance, is not lost when he irrevocably transfers the insurance to his beneficiaries during his life.

The payment of premiums provision appears to be intended as a means of preventing avoidance of the estate tax by irrevocable transfers of life insurance. See H. Rept. No. 1337 (dealing with the Internal Revenue Code of 1954), 83d Cong., 2d Sess., pp. B1, B14, and

B15, and H. Rept. No. 775 (dealing with the Technical Amendments Act of 1957), 85th Cong., 1st Sess., p. 37.

We hold that section 811 (g) (2) (A) is not arbitrary and carpricious and does not violate the due process clause of the Fifth Amendment. And this is so even though the tax is imposed upon the proceeds of the insurance proportionately to the premiums paid by the decedent, rather than simply upon the premiums paid by the decedent. The insurance proceeds pass to the beneficiary at the death of the insured—they are a product of the premiums. There is in effect a transfer of property procured through expenditures by the decedent. *Chase Nat. Bank* v. *United States, supra.* Furthermore, in order to prevent tax avoidance, it is necessary to measure the tax by what passes at death. Thus, there is no denial of due process by imposing the tax upon the proceeds.

We note that the initial premiums on the insurance policies were paid prior to the amendment to the Revenue Act of 1942 which added the premium payments test to section 811 (g). However, section 404 (c) of that Act specifically provided that any premium payments made subsequent to January 10, 1941, were to be included in determining what proportion of the proceeds was attributable to premiums paid by the decedent. January 10, 1941, was the date that T. D. 5032, 1941–1 C. B. 427, was promulgated. T. D. 5032 amended the regulations at that time and in so doing explicitly taxed insurance to the estate of the insured under the premium payments test. The decedent was thus on notice, at the time he paid the initial premiums on the policies, that his estate might be taxed as a result of his indirect payment of the premiums. See *Colonial Trust Co.* v. *Kraemer*, 63 F. Supp. 866 (D. Conn., 1945). The retroactive effect of the premium payments test insofar as its application in this case is concerned, does not, we think, violate the due process clause of the Fifth Amendment. *Milliken* v. *United States, supra.*

Reviewed by the Court.

*Decision will be entered for the respondent.*