**UNITED STATES v. TONKIN et al.**

No. 8804.

Circuit Court of Appeals, Third Circuit.

Argued June 6, 1945.

Decided July 3, 1945.

Leland T. Atherton, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and A. F. Prescott, Sp. Assts. to Atty. Gen., and Charles F. Uhl, U. S. Atty., of Pittsburgh, Pa., on the brief), for appellant.

Charles F. C. Arensberg, of Pittsburgh, Pa. (James S. Crawford, Ella Graubart, and James B. Sayers, all of Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, MARTIN and Mc-LAUGHLIN, Circuit Judges.

MARTIN, Circuit Judge.

Five days after the hearing and submission of this appeal, the Supreme Court promulgated an opinion which we think points directly to reversal of the judgment of the district court in the instant case. See Goldstone et al. v. United States of America, 325 U.S. ——, 65 S.Ct. 1323.

In the Goldstone case, a sixty-three-year-old man had procured, simultaneously, two contracts from an insurance company; for one of which he paid $14,357.08, insuring his life for $18,928 for the benefit of his wife; or, if she predeceased him, his daughters; with the proviso that if all beneficiaries should predecease him, the proceeds of the contract were to be paid to his executors, or administrators.

To procure this contract, the insured, in lieu of physical examination, was required to purchase an annuity contract for which he paid a single premium of $12,142.92. Under this annuity contract, semi-annual instalments of $386.51 were payable to the insured during his lifetime and, upon his death, $6,071.46 was payable to his wife; or, if she should predecease him, to their daughters, if living; and, if the daughters were dead, the sum was payable to his estate.

Both contracts designated the wife as "Owner" or "Purchaser", and the husband as "Insured" or "Annuitant". Each contract gave the wife the unrestricted right of assignment, the right to change the beneficiaries, to surrender the contract for its cash surrender value, to receive dividends, and to borrow money on the contract. The contracts provided that, should the wife predecease the insured, all the enumerated powers were to vest in the insured to the extent that such powers had not otherwise been exercised by his wife.

Four years and a few months after the single premium life insurance policy and the annuity contract had been procured, as described, the insured died, survived by his wife and daughters. The wife had not surrendered, assigned or alienated either contract prior to her husband's death. The insurance company paid her,

forthwith, the total amount of $25,181.70, whereof $6,071.46 was paid under the annuity contract, $18,928 under the life insurance contract, and $182.24 as accumulated dividends.

Pursuant to Section 302(c) of the Internal Revenue Act of 1926, as amended, Internal Revenue Code, Section 811(c), 26 U.S.C.A. Int.Rev.Code, § 811(c), the Commissioner of Internal Revenue determined that the proceeds of the two contracts were includible in the gross estate of the decedent for estate tax purposes and assessed the estate a deficiency of $5,376.11, for which the executors filed a claim for refund. Upon rejection of this claim, an action by the executors was instituted in the district court, which sustained the Commissioner, and the Court of Appeals for the Second Circuit affirmed the judgment. Goldstone v. United States, 144 F.2d 373. In a footnote to the original opinion of the Supreme Court it was stated that the judgment below is inconsistent with the result reached in Lloyd's Estate v. Commissioner of Internal Revenue, 3 Cir., 141 F.2d 758, and with the prior affirmance by the Second Circuit Court of Appeals (138 F.2d 512) of the decision of the Board of Tax Appeals in Estate of Ballard v. Commissioner, 47 B.T.A. 784. On June 18, 1945, this footnote was ordered to be so amended as to read as follows: "The judgment below is stated by the United States to be inconsistent with the result reached in Lloyd's Estate v. Commissioner [of Internal Revenue], 3 Cir., 141 F.2d 758, and to be in harmony with Bailey v. United States, 31 F.Supp. 778, 90 Ct.Cl. 644. The United States also claims that the result below is inconsistent with the same court's prior affirmance of Estate of Ballard v. Commissioner, 47 B.T.A. 784, affirmed 2 Cir., 138 F.2d 512. In view of the manner of our disposition of the instant case, however, we have no occasion to determine whether these asserted conflicts exist or whether the decision here necessarily controls the factual situations presented in these other cases." [65 S.Ct. 1325]

Mr. Justice Murphy, writing for the Supreme Court, cited and discussed its earlier opinions in Fidelity-Philadelphia Trust Co. v. Rothensies, 324 U.S. 108, 111, 65 S.Ct. 508; Helvering v. LeGierse, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996; Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368; and Chase National Bank v. United States, 278 U.S. 327, 337, 49 S.Ct. 126, 73 L.Ed. 405, 63 A.L.R. 388. Declaring that testamentary disposition of an inter vivos character cannot escape the force of the pertinent Act "by hiding behind legal niceties contained in devices and forms created by conveyancers", the jurist stated that the procedure employed did not conceal the fact that the decedent had used the two contracts "as a means of effecting a transfer of approximately $25,000 of his estate to the natural objects of his bounty." It was pointed out that the decedent had retained not only the right to semi-annual payments under the annuity contract, but also a contingent reversionary interest in the entire proceeds of both contracts, so that the ultimate disposition of the proceeds of the contracts was suspended until the moment of his death. Only upon that event did the respective interests of the wife and daughters become fixed, terminating all decedent's potential rights. Inasmuch as the transfer of the proceeds of the contracts had been effectuated finally and definitely upon his death, such proceeds were held to be includible in the gross estate of the decedent. The conclusion reached was declared to be unaltered by the fact that the wife had unrestricted power, during the insured's lifetime, to exercise many important incidents of ownership over the contracts, "including the power to terminate the decedent's reversionary interest in the proceeds"; the string which the decedent had retained over the proceeds of the contracts until the moment of his death being considered no less real or significant because of his wife's unused power to sever it at any time.

The Supreme Court regarded as the essential element in the case the decedent's possession of a reversionary interest at the time of his death, delaying until then the determination of the ultimate possession or enjoyment of the property which, of itself, was deemed sufficient to support the imposition of the estate tax. Declaring that the imposition and computation of the estate tax are based upon the interests in actual existence at the time of the decedent's death, the Supreme Court stated that unrealized possibilities which might have erased a decedent's reversionary interest must be ignored, being significant, if at all, only as adding to the remoteness of the reversionary interest.

From the rationale of the opinion, as well as from the decision by the Supreme Court

upon the narrated facts, we regard the Goldstone case as controlling authority here.

In the instant case we are confronted with a situation where John B. Tonkin of Pittsburgh, Pennsylvania, who was over sixty-one years old and had served for more than forty years with the Standard Oil Company of New Jersey and its subsidiary, the Peoples Natural Gas Company, of which he was president and under its pension plan eligible for retirement, created on December 3, 1936, a trust under which he transferred to a trust company, as trustee, 2204 shares of the capital stock of Standard Oil Company of New Jersey and certain policies of insurance on his life. The trust indenture contained the following important provision: "During the Insured's lifetime the Trustee shall invest moneys arising in its hands hereunder in policies of insurance issued by substantial American companies upon the Insured's life if directed so to do by the Insured's wife, May S. Tonkin, and in purchasing any such insurance contract or contracts the said Trustee may pay premiums annually, may discount or prepay premiums for any period of years and in general may effect with insurance companies any arrangements in respect to premium payment or payments accordingly as the Insured's said wife shall see fit to direct. *Particularly, the Trustee shall purchase single premium insurance upon the Insured's life if directed to do so by the Insured's wife.*" [Italics supplied.] It was further expressly provided that, if the insured's wife should see fit to direct the purchase of insurance and the trustee should have on hand insufficient cash to do so, it would be obligatory upon the trustee to convert assets in the trust estate to the extent necessary to carry out the directions of the insured's wife.

On December 9, 1936, six days after the trust indenture was executed, Mrs. Tonkin, by letter, directed the trustee to sell all the Standard Oil stock held by it as trustee and to apply so much of the proceeds thereof as should be necessary to purchase $200,-000 of single premium life insurance upon the life of her husband, John B. Tonkin. The trustee complied with her instructions; and, at the same time that the trustee purchased five single premium insurance contracts on his life, John B. Tonkin purchased non-refundable single premium life annuity contracts from the same issuing insurance companies. The stipulation of facts states that "the insurance companies would not have issued the single premium life insurance contracts on decedent's life unless at the same time such contracts were purchased there were also purchased the single premium non-refundable life annuity contracts hereinbefore mentioned." No medical examination or evidence of insurability was required of the decedent as a condition precedent to the issuance of the single premium life insurance contracts and the single premium non-refundable life annuity contracts which were acquired. One week after the execution of the trust indenture, John B. Tonkin made and executed his last will and testament, to which he added a codicil several weeks later.

As found by the district court, Tonkin was in good health at the time he executed the trust agreement and was anticipating a joyous life after his retirement from active business. He enjoyed travel, played golf regularly, and "often expressed confidence that he would outlive his father, who died at ninety-two." His prediction, however, failed to come true, for he died on January 26, 1940, at the age of sixty-four years and four months, slightly more than three years after he had executed the trust agreement.

The trust indenture provided that the net income derived from the trust estate should be paid to the settlor's wife, May S. Tonkin, "until the death of the first one of the Insured and his wife to die." Should his wife predecease him, the full net income of the trust estate would, during the remainder of the insured's lifetime, be payable to numerous named beneficiaries. From and after the death of the insured, the trustee was directed to pay to the insured's wife an annual income of $9,000, during the remainder of her natural life, in such instalments and at such periods as should be desired by her; and the trustee was empowered to encroach upon the principal to that end. The trust instrument directed that, upon the death of the survivor of the insured and his wife, the trustee should divide the remaining principal of the trust estate into six equal parts or shares for distribution among his named or described relatives, as directed.

Thus, by the terms of the trust instrument, the corpus of the trust estate was not distributable to the beneficiaries, except at the time of or after the death of the settlor, inasmuch as the corpus was dis-

tributable upon the death of the survivor of the decedent and his wife. In the event of the failure of a remainderman, the principal of the trust would, of course, revert to the decedent, or to his estate, by operation of law.

Decedent filed a gift tax return for the calendar year 1936, and reported for taxation the value of the 2204 shares of Standard Oil Company stock transferred to the trustee and the value of one of the policies of insurance. After taking his exclusions and exemptions, he paid a gift tax of $7,056.29. The Commissioner of Internal Revenue, however, determined a deficiency in the estate tax of decedent, which was paid; and an action for refund in the amount of $45,930.95, with interest, was filed in the district court by the Executors of the Estate of John B. Tonkin. The district court entered judgment in favor of the plaintiffs for the amount claimed, with interest, finding, inter alia, that contemplation of death was not an impelling motive for the gifts made by Tonkin in 1936; that these gifts were not transfers intended to take effect at or after his death; and that his impelling motive in purchasing the annuities was not to enable the trustee named in the deed of trust of December 3, 1936, to purchase single premium life insurance policies on his life if the trustee were requested by Mrs. Tonkin to do so. The conclusion was drawn that the transfers were not made to take effect in possession or enjoyment at or after death, within the meaning of Section 302(c) of the Revenue Act of 1926, as amended, and consequently should not have been included in the gross estate by the Commissioner of Internal Revenue.

In his conclusions, the district judge emphasized the point that the letter of December 9, 1936, which Mrs. Tonkin wrote requesting the trustee to purchase policies of insurance on the life of her husband, was freely and voluntarily written by her; and that there is no evidence of any understanding or agreement with her husband that she should write the letter, or of any influence or coercion exercised by her husband upon her to request the trustee to purchase the single premium life insurance policies. The district judge stressed the conclusion that, under the terms of the trust agreement, it was discretionary with the trustee to purchase life insurance and to convert the insurance into other investments; and that the trustee was under no

obligation to retain any policies of life insurance purchased by it pursuant to a request by Mrs. Tonkin. It was concluded further that, since decedent died on January 26, 1940, at which time he had no incidents of ownership in the policies described, the proceeds of such policies are not includible in the gross estate, and are not taxable under Section 811(g).

It is obvious that the district judge was aware that a transfer may be "in contemplation of death" within the meaning of the Revenue Act, even though not induced by a fear that death is "near at hand", and that if the thought of death is the controlling motive prompting the disposition of property a transfer is properly held to be made in contemplation of death, for United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867, was cited in his discussion. We think, however, that he incorrectly applied the principles of that authority.

While, as stated by the district judge, it is true that in each case the circumstances must be examined to determine the motive of a donor in the light of his bodily and mental condition, it is also true that, if the facts are undisputed and the legal effect of contracts and documents is presented, as in the case at bar, a question of law arises as to whether in all the circumstances a transfer must be deemed as made in contemplation of death within the meaning of Section 811(c) of the Internal Revenue Code.

We consider the intervention of the trustee in the instant case as merely formalistic and of no substantial consequence. Tonkin attached no stronger strings, in vesting control of the trust estate in the trustee, than did Goldstone in vesting broad discretionary powers in his wife.

It is well to remember that, after the Commissioner of Internal Revenue has found that transfers in trust were made in contemplation of death, the taxpayer carries in the courts the burden of proving that the transfers were not so made. Wickwire v. Reinecke, 275 U.S. 101, 48 S.Ct. 43, 71 L.Ed. 840; First Trust & Deposit Co. v. Shaughnessy, 2 Cir., 134 F.2d 940, 941; McGrew's Estate v. Commissioner of Internal Revenue, 6 Cir., 135 F.2d 158, 160, 148 A.L.R. 1045. That burden was no more successfully carried by the taxpayer in the present case than it was carried in Kroger v. Commissioner of Internal Revenue, 6 Cir., 145 F.2d 901, certiorari denied 65 S.Ct. 915,

wherein the decision of the tax court upholding a deficiency assessment in the estate tax by the Commissioner of Internal Revenue was affirmed on appeal. Indeed, Kroger's transfers are less readily deducible as made in contemplation of death than are those of Tonkin.

■ In the light of the principles proclaimed and applied in Goldstone v. United States, supra, which we deem apposite here, the conclusion seems inescapable that the purchase of the single premium life insurance policies and the annuity contracts procured by Tonkin was an indivisible transaction, made in contemplation of death within the meaning of the pertinent section of the Revenue Act. The ultimate disposition of the proceeds of the contracts was suspended until the moment of Tonkin's death. We are constrained, therefore, to hold that the findings and conclusions of the district court that the Tonkin transfers and transactions here involved were not made in contemplation of death are clearly erroneous.

Accordingly, the judgment of the district court is reversed; and the cause is remanded for further proceedings in conformity with this opinion.