GREGORIO MANAUTOU, demandante y recurrente, *v.* JOSÉ R. NOGUERA, SECRETARIO DE HACIENDA DE PUERTO RICO, demandado y recurrido.

Número: 391    Resuelto: 31 de enero de 1963

R. B. Pérez Mercado, abogado del recurrente; *J. B. Fernández Badillo, Procurador General, Arturo Estrella, Sub-Procurador General, Rodolfo Cruz Contreras, Procurador General Interino, Genoveva R. de Carrera, Procurador General Auxiliar,* e *Irene Curbelo, Procurador General Auxiliar,* abogados del recurrido.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Dos cuestiones principales envuelve el presente recurso: ¿Está sujeto a tributación bajo las disposiciones vigentes de la Ley Núm. 303 de 12 de abril de 1946, 13 L.P.R.A. sec. 881 *et seq.*, conocida como la Ley de Contribuciones sobre Herencia, el valor conmutado de pólizas de vida de renta vitalicia? ¿Es deducible a los fines de la liquidación de dicha contribución el importe de los honorarios de abogado satisfechos por un fiduciario para la disolución de un fideicomiso constituido por el causante cuyo corpus se distribuyó entre determinadas personas al ocurrir el fallecimiento de dicho fideicomitente?

## I

En el ocaso de su vida—contaba entonces cerca de setenta años de edad—don José Manautou Fantauzzi adquirió cuatro pólizas de renta vitalicia, entre las cuales se encontraban tres expedidas a favor del propio asegurado o comprador con cláusula de sustitución a su óbito por la que se designaba como beneficiario a su hermano el recurrente don Gregorio Manautou. El valor conmutado de las mencionadas tres pólizas se fijó en la suma de $32,009.54, cantidad que el Secretario de Hacienda adicionó al valor de los demás bienes recibidos por el recurrente a título de herencia testada de su hermano a los fines de la liquidación de la contribución impuéstale en virtud de las disposiciones de la Ley Núm. 303.

Para una mejor comprensión de los hechos reseñaremos las estipulaciones básicas de los tres contratos a que hemos venido haciendo referencia:

A) Núm. 437–429 de Pan American Life Insurance Co., de fecha 26 de junio de 1947: Mediante el pago de una prima

única de $14,000, la compañía se obligó a pagar una renta vitalicia de $105.55 mensuales, con pagos garantizados por diez años completos ($13,666), al rentista don José Manautou comenzando tres años después; y en caso de fallecimiento de éste después de la fecha de retiro, los pagos se harían al beneficiario don Gregorio Manautou, hasta completar los diez años mencionados. El fallecimiento del rentista ocurrió en 5 de marzo de 1953; percibió, por tanto, treinta y tres mensualidades, o sea, $3,483.15. El valor conmutado de esta póliza se fijó en $8,399.17.

B) Núm. 11,239 de la Confederación del Canadá, de fecha 11 de agosto de 1947: Mediante el pago inmediato de la suma de $13,563.00, la compañía se obligó a pagar la suma trimestral de $225.00 durante la vida natural del rentista; pero si éste fallecía antes de haber recibido en pagos de renta una suma igual a la del "precio de compra," se pagaría al beneficiario Gregorio Manautou una suma igual a la diferencia existente entre los pagos de renta recibidos y el importe de dicho precio de compra. El rentista recibió hasta su fallecimiento pagos de renta por un total de $4,950.00; el valor conmutado del contrato se fijó en $8,613.00.

C) Núm. A–34060 de la Sun Life Assurance Company of Canada, de fecha 28 de febrero de 1951: Mediante el pago anticipado de la suma de $20,000, la compañía convino en pagar semestralmente la suma de $676.90 al "rentado" don José Manautou; pero si el rentado fallecía antes de haberse pagado la renta durante 15 años completos, los pagos continuarían haciéndose al beneficiario don Gregorio Manautou hasta completar dichos 15 años. El rentado recibió rentas por $2,707.60; el valor conmutado de esta póliza se fijó en $14,997.37.

La cuarta póliza de renta vitalicia fué adquirida por el causante por compra a la Manufacturer's Life Insurance

Co., (¹) y en la misma se designó como beneficiaria a la señora María Lavergne, y en caso de muerte de ésta, al recurrente. El valor conmutado de este contrato a la fecha del fallecimiento de don José Manautou se fijó en $7,816.00, cantidad que se incluyó en la participación de la señora Lavergne, y sobre la cual se impuso y se satisfizo la contribución correspondiente. Poco tiempo después, al ocurrir la muerte de la beneficiaria mencionada, el Secretario atribuyó a este contrato un valor conmutado de $7,141.00 y lo adicionó a los otros bienes recibidos por el recurrente. En relación con esta suma plantea el recurrente que, en caso de que se resolviera que procede incluir el valor conmutado de estos contratos entre los bienes por él recibidos, tiene derecho al crédito del cinco por ciento que se establece en el apartado (b) del Art. 5 de la Ley Núm. 303, 13 L.P.R.A. sec. 887(b). (²)

El tribunal a quo resolvió que el valor conmutado de los referidos contratos formaba parte de los bienes sujetos a tributación porque a) una renta vitalicia constituye una donación para fines de la ley; y, b) como conforme al Art. 15 de la Ley Núm. 303, 13 L.P.R.A. sec. 882, el término "propiedad" incluye rentas vitalicias o *anualidades* de cualquier forma, de acuerdo con la Sec. 1(a), 13 L.P.R.A. sec. 881, cualquier propiedad que se transfiera por menos de su justo valor constituye una donación.

---

(¹) Este contrato no fue ofrecido en evidencia, y la información que ofrecemos la hemos obtenido de un examen de la hoja de liquidación de la "herencia dejada por José Manautou Fantauzzi" preparada por la División de Herencia del Departamento de Hacienda.

(²) Dicho apartado lee como sigue:

"Cuando una parte o la totalidad de los bienes comprendidos en la donación procede directa o indirectamente de bienes que han estado sujetos a contribución sobre herencia, donación o sucesión dentro de los veinte años anteriores a la fecha de la donación, se concederá como crédito por cada año en que el intervalo transcurrido sea menor de veinte años, una suma igual al cinco (5) por ciento de dichas contribuciones anteriores, o un crédito de 5 por ciento de la contribución pagada sobre cada donación anterior por cada año de la edad que haya cumplido el donatario cuando el donante de dicha donación anterior haya cumplido 50 años si estuviere vivo o hubiera cumplido 50 años en caso de haber fallecido...."

■ En *Freeman* v. *Srio. de Hacienda*, 82 D.P.R. 307, 310–312 (1961), hicimos un recuento de la legislación sobre imposición de "contribución de herencia" desde el cambio de soberanía hasta el presente. (3)  Al caracterizar la situación actual, dijimos: "Mediante la Ley Núm. 303 de 12 de abril de 1946, supra, se altera sustancialmente la tributación de los bienes transmitidos por herencia, y se adopta un sistema que es en esencia una contribución sobre la *transferencia* de bienes.  Al efecto se amplía el ámbito de la imposición y prácticamente se incluye toda clase de transferencias, sean éstas *inter vivos* o *mortis causa*.  La contribución deja de ser exclusivamente una sobre los bienes o las personas, y específicamente sobre el caudal hereditario, y se convierte en una que considera como suceso tributable la transferencia o transmisión de bienes, o sea que recae sobre la facultad de *transmitir los bienes o sobre el derecho a heredar*."  Amplios son los términos de la definición de "donación," *Veve* v. *Srio. de Hacienda*, 78 D.P.R. 731, 736 (1955), pero el alcance de tal manifestación no va más lejos de lo expresado en *Blanco* v. *Registrador*, 70 D.P.R. 17, 19 (1949), al efecto de que se define e incluye como donaciones tributables "algunas transacciones que nunca antes habían sido clasificadas en tal forma bajo el derecho civil."  Se deduce, pues, que para que pueda imponerse la contribución dispuesta por dicha ley es necesario que la transacción o transferencia efectuada esté incluida o comprendida dentro de alguna de las definiciones de la Sec. 1, 13 L.P.R.A. sec. 881. (4)  Sentada esta premisa básica, nos resta examinar si los contratos de rentas vitalicias en-

(3) En *Silva* v. *Srio. de Hacienda*, 86 D.P.R. 332 (1962), se hace referencia al sistema contributivo imperante en cuanto a las transferencias por herencia bajo el régimen español.

(4) En relación con la imposición de contribución sobre bonos de Estados Unidos con motivo de la muerte de la persona o una de las personas a cuyo favor aparecen expedidos, véanse, *Ronda* v. *Torres*, 71 D.P.R. 702 y *Veve* v. *Secretario de Hacienda*, 78 D.P.R. 731 (1955); cfr. *Ab Intestato de Nakdimen*, 83 D.P.R. 459 (1961).

190

vueltos en este caso están comprendidos dentro de alguna de las definiciones de donación de la citada sección. (⁵)

■ Antes, echemos una rápida ojeada a la situación prevaleciente en la jurisdicción federal. Antes de la aprobación del Código de Rentas Internas Federal de 1954, un contrato de renta vitalicia mediante el pago de anualidades no estaba cubierto por disposición específica alguna de la ley imponiendo contribución sobre herencia; se le cobijaba, por interpretación de los tribunales, bajo la categoría genérica de transferencias en consideración o para tener efecto a la muerte del causante (*transfers in contemplation of, or taking effect at death*), o en las cuales éste retenía algún grado de posesión o disfrute hasta su muerte. Sec. 811(c) de la Ley de Rentas Internas de 1939, 26 U.S.C. (Internal Revenue Code of 1939) sec. 811 (c); *Helvering* v. *La Gierse*, 312 U.S. 531 (1941); *Conway* v. *Glenn*, 193 F.2d 965 (C.A. 6, 1952); *Burr* v. *Commissioner of Internal Revenue*, 156 F.2d 871 (C.A. 2, 1946); *United States* v. *Tonkin*, 150 F.2d 531 (C.C.A. 3, 1945); *Mearkle's Estate* v. *Commissioner of Internal Revenue*, 129 F.2d 386 (C.C.A. 3, 1942); *Commissioner of Internal Revenue* v. *Clise*, 122 F.2d 998 (C.C.A. 9, 1941), comentado en 40 Mich. L. Rev. 924 (1942); *Helvering* v. *Tyler*, 111 F.2d 422 (C.C.A. 8, 1940); cfr. *Fidelity-Philadelphia Trust Co.* v. *Smith*, 142 F. Supp. 561 (E-D Pa. 1956), comentado en 43 Minn. L. Rev. 354 (1958); *Ford* v. *Kavanaugh*, 108 F. Supp 463 (E-D Mich. 1952); Foosaner, *Taxation of Life Insurance and Annuities* (1960), sec. 11.01 y ss., págs. 264–267; Lasser, *Estate Tax Handbook* (1951), págs. 225–226; *Estate Taxation of Survivor Annuities, Section 811 (c) and the Proposed I. R. C. of 1954*, 6 Stan. L. Rev. 472 (1954); Nota, 49 Yale L. J. 946 (1940); Nota, 32 Ill. L. Rev. 223, 232 (1937). No es hasta la aprobación del Código de 1954 que se adopta una disposición específica incluyendo el valor de las anualidades en el

(⁵) Cfr. Mertens, *Law of Federal Gift & Estate Taxation* (1959), vol. 2, Cap. 13 (Exclusiveness of Gross Estate Sections), pág. 30 *et seq.*

caudal bruto tributable, 26 U.S.C. sec. 2039; Mertens, *Law of Federal Gift & Estate Taxation* (1959), vol. 2, cap. 18. La Ley Núm. 303 no contiene una disposición similar a la Sec. 811(c).([6]) Y, por tanto, aunque aceptemos que el recurrente como beneficiario recibió una transferencia en consideración a, o para tener efecto a, la muerte del causante, no podemos considerarla tributable. Esta dificultad nace del carácter peculiar de nuestro estatuto que específicamente enumera las transacciones que se considerarán como "donaciones tributables", y que en sus definiciones más generales tiende a referirse a transferencias a título hereditario. Es la consecuencia inevitable de la unión híbrida de disposiciones de contribución sobre transferencia—Ley Núm. 303 de 1946—y de contribución sobre herencia—Ley Núm. 99 de 1925—.

Analicemos la cuestión a la luz de las definiciones estatutarias locales de "donación tributable."

a—Convenimos con el recurrente en que las rentas vitalicias y anualidades a que se refiere la Sec. 15 de la Ley Núm. 303, *supra,* que define como "bienes" o "propiedad", "tanto bienes raíces como bienes muebles y semovientes y cualquier forma de participación en ellos, incluyendo rentas vitalicias o anualidades de cualquier forma o clase, así como el usufructo, la nuda propiedad o cualquier clase de derechos y acciones," no incluye los contratos de seguro de renta vitalicia. Bajo la ley mencionada, estos conceptos tienen el mismo significado y alcance que tenían bajo el Art. 14 de la Ley Núm. 99 de 29 de agosto de 1925 (Leyes, pág. 791)

---

([6]) La Sec. 42 del proyecto de la nueva ley para la imposición de contribución sobre herencia y donaciones expresamente dispone que "[e]l valor del caudal hereditario bruto incluye el monto de cualquier póliza de seguro, contrato de anualidades y otros contratos, pagaderos a beneficiarios (designados o no designados) sobre la vida del causante, independientemente de la persona que pagó las primas o el costo del contrato y sin considerar los derechos del causante sobre la póliza o contrato a la fecha del fallecimiento."

de donde fué trasladado literalmente el precepto. (⁷) Parece claro que en esta ley original su alcance y significado se refería a las rentas y anualidades provenientes de los contratos de renta vitalicia y censos previstos por los Arts. 1496 (⁸) y 1702 (⁹) del Código Civil, ed. 1930, 31 L.P.R.A. secs. 4171 y 4791. Ello es así porque son los únicos que podrían clasificarse como "participación" en bienes inmuebles, como requiere la ley, y como obviamente son el usufructo y la nuda propiedad a que se refiere expresamente la disposición que discutimos. (¹⁰) Además, esta definición se refiere al objeto de la donación, pero no a las transacciones que, por incluirse dentro de las definiciones de donaciones de la Sec. 1 de la Ley Núm. 303, *supra*, dan margen a la tributación.

b—Mediante la Ley Núm. 103 de 25 de abril de 1950 (Leyes, pág. 263), se adicionó como definición del término donación tributable "cualquier traspaso de propiedad con la obligación por parte del adquirente de pagar al transmitente cualquier renta vitalicia, aunque ésta sea equivalente al rédito producido por el valor de la propiedad." Esta actuación legislativa respondió sin duda a la opinión emitida por este Tribunal en *Blanco* v. *Registrador*, 70 D.P.R. 587 (resuelto en 28 de noviembre de 1949), en donde habíamos sostenido que la transferencia de una propiedad a cambio de una renta vitalicia, si ésta resulta ser mayor que el canon de arrendamiento sobre el inmueble y no inferior al tipo de interés legal,

---

(⁷) Idéntica redacción contenía el Art. 380 del Código Político aprobado en 1 de marzo de 1902. Estatutos Revisados, 1902, pág. 499; Estatutos Revisados, 1911, Sec. 3087, pág. 620.

(⁸) "Se constituye el censo cuando se sujetan algunos bienes inmuebles al pago de un canon o rédito anual en retribución de un capital que se recibe en dinero, o del dominio pleno o más o menos pleno que se transmite de los mismos bienes."

(⁹) "El contrato aleatorio de renta vitalicia obliga al deudor a pagar una pensión o rédito *anual* durante la vida de una o más personas determinadas por un capital en bienes muebles o inmuebles, cuyo dominio se le transfiere desde luego con la carga de la pensión."

(¹⁰) Esta referencia expresa al "usufructo, la nuda propiedad ● cualesquiera clase de derechos y acciones" se adicionó mediante la Ley Núm. 189 de 13 de mayo de 1948 (Leyes, pág. 527).

no constituye una donación tributable, ya que el cesionario recibirá la propiedad prima facie por su justo valor. Véanse, *Blanco* v. *Registrador*, 70 D.P.R. 17 (1949); cfr. *Greene* v. *United States*, 237 F.2d 848 (C.A. 7, 1956); *Updike* v. *Commissioner*, 88 F.2d 807 (C.C.A. 8, 1937). A poco que se examine esta disposición se verá inmediatamente que los contratos de seguro de renta vitalicia no están incluídos, ni expresamente ni por implicación, en la definición transcrita. Como podrá observarse, en el contrato de seguro quien recibe el capital y satisface la renta es la compañía aseguradora; el beneficiario no recibe capital alguno, y solamente percibe la renta a la muerte del rentista.

C—"Cuando una propiedad se transfiere por menos de su justo valor, bien por dinero, su equivalente en dinero, o mediante permuta, el exceso del justo valor de dicha propiedad sobre el valor del dinero, del equivalente en dinero o de la cosa por la cual se transfiere dicha propiedad se considerará donación", reza el segundo párrafo de la Sec. 1(a) de la Ley Núm. 303, *supra*. Esta disposición referente a transferencias por causa insuficiente tiene su concordancia en las Secs. 2043 y 811(2) de los Códigos Federales de Rentas Internas de 1954 y 1939, 26 U.S.C. sec. 2043 y 26 U.S.C. (I.R.C. 1939) sec. 811(c). Mertens, *op. cit.*, vol. 1, sec. 5.03, págs. 250–260, explica que esta sección a) supone una reducción o deterioro en el patrimonio del donante; b) la causa que se recibe debe ser dinero o su equivalente—bienes, servicios o cualquier beneficio que tenga un valor determinable en dinero—.([11])

El autor mencionado señala, a las págs. 281–282, que "Se reconoce como causa suficiente y completa (*adequate and full consideration*) cuando el cedente recibe una anualidad cuyo valor determinado a la fecha de la transferencia, es igual al valor de los bienes cedidos." Véanse, *Olson* v. *Rei-*

([11]) Véase, *Pedraza Mulero* v. *Registrador*, 85 D.P.R. 238 (1962), sobre renuncia de usufructo por una madre a favor de sus hijas; cfr. *Consolidated Cigar* v. *Registrador*, 83 D.P.R. 751 (1961).

*simer*, 170 F. Supp. 541 (E–D Wis. 1959) ; *Nourse* v. *Riddell*, 143 F. Supp. 759 (S–D Cal. 1956) ; *United States Nat. Bank of Portland (Ore.)* v. *Earle*, 45 A.F.T.R. 1317 (D–C Ore. 1953). Esa es precisamente la situación que encontramos en el presente caso, pues la renta garantizada en los contratos es sustancialmente igual a la "prima única" satisfecha por el asegurado.

d—Presumiendo, argüendo, que a los fines de la ley se consideren los contratos de renta vitalicia como modalidades del seguro de vida,([12]) tampoco estarían incluidos pues la definición pertinente se refiere únicamente a las pólizas ordinarias de vida o dotales. Aclaramos, no obstante, que el hecho de que no se incluyeran los contratos de seguro de renta vitalicia en este párrafo no los coloca *ipso jure* fuera de la aplicación de la ley, siempre que califiquen bajo cualquiera otra de las definiciones legislativas de donación tributable.

e—Descartadas ya las posibilidades de tributación bajo las definiciones referentes a renta vitalicia, transferencia por menos de su justo valor y seguro de vida, réstanos examinar si los contratos de seguro de renta vitalicia pueden conside-

([12]) Tanto el Art. 328 del Código de Comercio, 26 L.P.R.A. sec. 1281, como la Sec. 156 de la Ley de Seguros vigente a la fecha del otorgamiento de los contratos y la muerte del asegurado (Ley Núm. 66 de 16 de julio de 1921, 26 L.P.R.A. sec. 1005), consideraban comprendido dentro del seguro de vida cualquier "combinación . . . pactando entregas de primas o entregas de capital a cambio de disfrute de renta vitalicia o hasta cierta edad . . ." Véase, el Art. 13.130 del Código de Seguros de 1957, 26 L.P.R.A., tomo 5A, sec. 1313.

Los tribunales americanos han trazado fundamentales diferencias entre el seguro de vida y las anualidades provenientes de un contrato de renta garantizada o vitalicia, especialmente desde el punto de vista del riesgo envuelto. La distinción se ha establecido principalmente a los fines de determinar si éstos califican a los fines de exenciones concedidas al producto de pólizas de vida. Para un excelente resúmen sobre este punto, véase, Comentario en 35 Boston U. L. Rev. 317, 320–322 (1955). Véanse, además, *In re Clark's Estate*, 354 P.2d 112 (Utah, 1960) ; *Day* v. *Walsh*, 42 A.2d 366 (Conn. 1945) ; *Sucession of Rabouin*, 9 So.2d 529 (La. 1942) ; *Daniel* v. *Life Ins. Co. of Virginia*, 102 S.W.2d 256 (Texas 1937) ; *Hall* v. *Metropolitan Life Ins. Co.*, 28 P.2d 875 (Ore. 1934) ; *In re Rhodes Estate*, 94 N.Y.S.2d 406 (1949) ; *Federal Taxation of Combined Annuity and Life Insurance Contracts*, 49 Yale L. J. 946 (1940).

rarse como una transferencia hecha "por herencia, por testamento o abintestato." ([13])   Nuevamente se impone una solución negativa, pues el pago de las anualidades o rentas al beneficiario a la muerte del asegurado no constituye una transferencia por testamento o abintestato; el producto de la póliza se recibe en virtud de disposiciones contractuales. *Oliver* v. *Oliver*, 57 D.P.R. 491 (1940) ; *Espósito* v. *Guzmán*, 45 D.P.R. 796 (1933) ; cfr. *Wood* v. *Tribl. Contribuciones y Tes., Inc.*, 71 D.P.R. 233 (1950) ; *In re Gagan's Estate*, 256 P.2d 836 (Wash. 1953) ; *Rogers* v. *Oklahoma Tax Commission*, 263 P.2d 409 (Okl. 1952).   Anotación, *State succession, transfer, inheritance or estate tax in respect of life insurance and annuities*, 73 A.L.R. 2d 157, 171 (1960).

Este caso ilustra vivamente la inaplazable necesidad de que la Asamblea Legislativa revise la legislación vigente sobre contribución de transferencias *inter vivos* y *mortis causa*. Dieciséis años han transcurrido desde la aprobación de la Ley Núm. 303 con su desafortunada redacción que permite se sustraigan al efecto del propósito social que debe animar esta clase de legislación—el valor económico de los bienes es un producto social y a la comunidad se le reconoce el derecho a participar en ese valor—una serie de transacciones que por su efecto claramente constituyen transferencias en consideración o para tener efecto a la muerte.   Una ley sencilla, clara en sus definiciones, y fácil de administrar debe considerarse a la brevedad posible.

---

([13]) El civilista español Juan Vallet de Goytisolo sustenta la interesante teoría de que el seguro de vida a favor de un tercero constituye una modalidad de lo que él denomina donaciones indirectas, o sea, "otorgar en acto inter vivos donaciones indirectas de naturaleza mortis causa." Arguye que si por un medio jurídico válido, pero distinto a los formales requeridos por el Código, se obtiene el resultado típico de la donación —enriquecimiento del donatario y empobrecimiento del donante unido al animus donandi—, este resultado constituye una donación indirecta. Revista de Derecho Privado, tomo XXX (1946), págs. 943-958, especialmente a las págs. 946, 948 y 951-952; *La Donación Mortis Causa y el Código Civil*, Revista Crítica de Derecho Inmobiliario (1952), tomo 25, pág. 321; *La Donación Mortis Causa en el Código Civil Español*. Anales de la Academia Matritense del Notariado (1950), tomo 5, págs. 625, 798-828.

## II

Mediante documento de fideicomiso otorgado en la ciudad de Nueva York el día 26 de enero de 1953 don José Manautou Fantauzzi, como fideicomitente, entregó a la institución bancaria City Bank Farmers Trust Co., como fiduciaria, valores por $105,286.25, consistentes en 2,800 acciones de Central Aguirre Sugar Co., 1,000 acciones de The Royal Bank of Canada y 735 acciones de Fajardo Sugar Company. El fiduciario asumió la obligación de administrar los bienes fideicomitidos durante la vida del fideicomitente, y al fallecimiento de éste, de liquidar el fideicomiso y distribuir su importe en la forma dispuesta en el documento de su constitución, o sea, $10,000 a la señora María Lavergne, y el remanente al recurrente Gregorio Manautou.

El fideicomitente falleció en 5 de marzo de 1953, y el banco, en cumplimiento de su obligación contractual, procedió a liquidar y disolver el fideicomiso. Para ello usó los servicios profesionales del abogado O. B. Frazer, a quien se satisfizo "la cantidad razonable" de $3,000 por concepto de honorarios. Esta suma se dedujo por el banco del valor neto del fideicomiso, y por tanto, no fué efectivamente recibida por el recurrente en su participación. Al proceder a liquidar la contribución correspondiente, el Secretario incluyó entre los bienes sujetos a tributación el valor total de los bienes fideicomitidos, pero se negó a admitir como deducción la suma de $3,000 satisfecha para los propósitos indicados.

El tribunal de instancia sostuvo la actuación administrativa fundándose en que "el gravamen contributivo recae sobre las propiedades objeto de la transferencia desde el mismo instante de la muerte y cualquier gasto *incurrido posteriormente* sólo puede deducirse mediante gracia legislativa," y no encontrándose comprendida la presente entre las "deducciones" ([14]) autorizadas por la Sec. 4 de la Ley 303, su admisión era improcedente. Erró.

---

([14]) La Sec. 4 citada, 13 L.P.R.A. sec. 886, no trata propiamente de deducciones, sino de las *exenciones* que se conceden por razón de la exis-

■ En *Silva* v. *Srio. de Hacienda*, 86 D.P.R. 332 (1962), consideramos una situación similar. Al fallecimiento del causante se designó un administrador judicial para la conservación y defensa de los bienes relictos, de manera que una vez se justificara la inexistencia de herederos legítimos, se entregaran los mismos al Estado. Dos acciones de filiación fueron presentadas y el tribunal instruyó al administrador judicial para que se opusiera a las mismas, prestándose por éste—en su capacidad de abogado— los servicios profesionales necesarios hasta la terminación de los pleitos. Se fijó la suma de $14,785 como remuneración por la actividad profesional desplegada y se ordenó a los herederos victoriosos en las acciones filiatorias a satisfacerla, como en efecto lo fue. Dichos herederos presentaron una declaración enmendada a los fines de la imposición de la contribución e incluyeron como deducción al caudal la suma de $14,785 pagada por el concepto indicado. Después de una exposición sobre la naturaleza de la contribución—no es sobre "el derecho a transferir la totalidad de la masa hereditaria, sino al de la tributación sobre el derecho o privilegio de recibir su participación líquida e individual cada heredero, legatario o beneficiario de la herencia"—y de las operaciones necesarias para la liquidación del caudal hereditario, rechazamos el criterio adelantado por el Secretario y adoptado por el tribunal recurrido al efecto de que tal suma no era deducible porque la deuda surgió después de la muerte del causante, y sostuvimos que era improcedente en derecho que se incluyera tal importe como parte de los bienes "recibido[s] por los herederos," ya que "el cómputo contributivo se hace sobre *el importe numérico de la 'donación' que recibe el donatario.*" Para ello consideramos que a) se trataba de servicios prestados al caudal; b) su importe fué satisfecho

---

tencia de ciertas relaciones de parentesco, o incapacidad del donatario, o por tratarse de que el donatario es una asociación benéfica o una institución pública, generalmente sin fines pecuniarios.

198

con dinero procedente de la herencia; y, c) el pago fué involuntario porque emanó de un mandato judicial. Véanse, además, *Boerman* v. *Herederos de Boerman*, 52 D.P.R. 611, 620 (1938); *Franceschi* v. *Corte*, 45 D.P.R. 666, 672 (1933).

En el presente caso no hay duda de que las gestiones para la disolución y liquidación del fideicomiso eran imprescindibles para que el importe neto de los valores fideicomitidos se distribuyeran en la forma dispuesta por el fideicomitente. Los servicios fueron satisfechos con dinero procedente del propio causante. Y puede afirmarse que el pago fué involuntario porque fué dispuesto contractualmente por el propio fideicomitente en el documento de constitución del fideicomiso. A este respecto es bueno apuntar que no se impugnó la autenticidad o razonabilidad del pago efectuado al abogado Frazer.[15] En la instancia presentada por el recurrente se alegó expresamente el hecho del pago, y aún más, que se trataba de una "cantidad razonable." Estos hechos fueron expresamente admitidos en la contestación. Es procedente su deducción.[16]

*En virtud de lo expuesto precedentemente se revocará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en 19 de agosto de 1960, y se dictará otra en su lugar declarando con lugar la querella presentada, con los pronunciamientos procedentes.*

[15] Entre las deducciones admitidas por el Secretario de Hacienda figuran las siguientes que obviamente se relacionan con la liquidación del fideicomiso: al Lic. Bernardini Palés, por remitir documentos al Lic. Frazer a Nueva York, $100; por gastos misceláneos, Lic. Frazer en relación con administración (ancillary administration) en Nueva York, $175; al City Bank Farmers Trust Co., por concepto de comisiones adeudadas sobre el capital del fideicomiso, $1,540.72.

[16] En término generales, a igual solución se llega en relación con la imposición de la contribución federal. Mertens, *op. cit.*, vol. 4, sec. 26.37, pág. 136.